# STATE v. SOLOMON et al.

No. 5991.   Decided March 6, 1939.   (87 P. 2d 807.)

*H. G. Metos* and *Paul E. Reimann,* both of Salt Lake City, for appellants.

*Joseph Chez,* Atty. Gen., and *Zelph S. Calder,* Deputy Atty. Gen., for the State.

LARSON, Justice.

Defendants were convicted in the District Court of Salt Lake County of the crime of participating in a riot, and appeal. The case grew out of the following facts: In August, 1935, the Salt Lake County Emergency Relief Administration announced a cut in the amount of money allocated and that would thenceforth be distributed in the allowances or budgets of the unemployed. A considerable number of unemployed had affiliated themselves with a rather informal and indefinite organization called the National Unemployment Council. Handbills had been passed around among the unemployed generally announcing a mass meeting to protest this cut, to be held in front of headquarters of the Relief Administration at 10 o'clock on the 21st day of August. A committee of ten persons, representative of different sections of the county, was sent to interview Mr. Quigley, the chief administrator. Meanwhile the rest of the group, about 150 strong, held outside a meeting of protest against the relief cut, at which the defendant Solomon was one of the speakers. Quigley refused to receive a committee of ten but expressed a willingness to receive a committee of five. This was reported to the meeting outside. Two members of the committee withdrew and the other eight, followed by a considerable number of people from the group outside, entered the building. Apparently anticipating there might be trouble, the Relief officials had a number of policemen and deputy sheriffs present. When the crowd began to enter the building the doors were closed. Considerable disorder developed both inside the building and outside. There was loud shouting and threatening. Blows were struck both by the officers and the unemployed, and missiles were thrown. Windows and doors were broken. At the conclusion the defendants were arrested, charged with participating in a riot and in due time convicted. A conviction was by this court reversed and a new trial ordered. *State* v. *Soloman et al.*, 93 Utah 70, 71 P. 2d 104.

Upon retrial defendants were again convicted and prosecute this appeal. There are nine assignments of error but they may be stated in three propositions: (1) Claimed misconduct on the part of the district attorney. (2) Claimed error with respect to giving and refusing of instructions. (3) Claimed error with respect to admission and rejection of evidence. We note them in order.

(1) In the course of his argument to the jury the district attorney stated:

"The riot charged here is not an ordinary riot; *it is a riot against your government* * * * because a riot took place against the officers who were there to enforce the laws of the United States which we should honor and respect, and that is why I said, as I did, this isn't an ordinary riot case; and I want to say to you, my friends, this riot didn't commence on the 21st day of August. Technically this was the day when the scheme came into action, that is when they carried it into effect, and I say to you, gentlemen of the jury, that if we are to permit these *schemes*, maybe by people who have been misinformed; but if we are to *permit these schemes to get into action, as happened in this case,* and if we let these acts go and condone them, I am telling you, my friends, that we will be in rather a serious situation as far as our government is concerned.

"I am making these preliminary remarks to you in the hope of getting you to sense, as I think you do, the importance of this case.

"I have no personal enmity towards Solomon, or towards Shelley, or towards Sinclair or Woolman, or Allen; I have no personal enmity toward any of them at all, but, gentlemen of the jury, *when they adopt and approve the philosophy they have done, and endeavored to carry them into operation* as they did endeavor to do in this case, that is when I part company with them, and that is when I say they should be penalized for their acts.

"I am not worried so much about the penalty for the individual as I am in seeing that this type of thing does not go unchallenged, because if they are allowed to go unchallenged any helpful deterrent effect which would come from a conviction in this case could not prevent further trouble." (Italics added.)

At the beginning of this statement defendants' counsel objected. The court overruled the objection and told the district attorney he could proceed. It is contended that the use of the italicized words was outside the evidence and cal-

culated to arouse political passion and prejudice in the minds of the jury against the defendants.

That the challenged words were outside the evidence is clear. There was no evidence that this riot was against the government of the United States or the officers of the United States government. In fact the charge in the information and the evidence offered by the State showed merely that the defendants were, at most, concertedly disturbing the peace and quiet of certain persons in the relief headquarters by the use of or threats of use of violence toward such of them individually as blocked their path. Then again the argument that *"this riot did not commence on the 21st day of August"* and its designation as a *scheme* amounts to an argument that this riot had been planned and plotted some time before as a riot, uprising or rebellion against the government of the United States without any pleading, claim or evidence to that effect. But the argument went on to say that if these things were not punished, *"we would be in a serious situation as far as our government is concerned."* (Italics added.) The argument then savors of the idea that the case is important because defendants have adopted a certain philosophy. Couple such argument with the fact that after the naturalization examiner came in and sat beside the district attorney, the State had recalled one of defendants, Dave Sinclair (touched on later herein), and further cross-examined him on a wholly immaterial matter, his citizen or alien status, to show he was an alien, and the argument becomes poison. The argument is an appeal to prejudice and passion—an argument that defendants were aliens scheming to embarrass, and endanger, if not to overthrow the government. It was highly improper, prejudicial and presumptively detrimental to defendants' legal rights. The error was not alone that of the district attorney but was aggravated and emphasized by the court. When counsel for defendants objected to the argument the court promptly overruled the objection and told the district attorney he could proceed with

that line of argument, thus putting the court's stamp of approval on the argument, the reasoning, and the purported facts therein stated. Appeals to political, racial or religious prejudice or passion are always improper and in cases such as this where no political question was even remotely connected with the charge, the misconduct of the district attorney and the palpable error of the trial court in its ruling thereon were departures so far from that which is proper or legal as to necessitate a reversal of the verdict and judgment.

(2) Defendants complain of the refusal of the court to give the jury their requested instruction No. 8. The matters therein were properly covered by the court's instructions Nos. 10 and 12. This point therefore is resolved against appellants.

(3) Appellants assail the action of the court in refusing to receive in evidence their proposed Exhibit 4. This exhibit consisted of a paragraph from a letter written by the State Advisory Committee on Public Welfare and Emergency, which reads:

"It shall be clearly understood that persons on relief have the legal right to organize themselves into associations or other bodies. Administrative officials should make every attempt to hear all complaints and suggestions presented by representatives of such associations or bodies."

The court also denied appellants the right to cross-examine Wilkinson, a guide at Relief Headquarters as to his knowledge of this rule, it being appellants' contention that such proof was necessary to show their reason for being at Relief Headquarters at the time of the disturbance, and also to show that it was the duty of Quigley to receive the committee, and the court's rulings against them were therefore prejudicial. The point urged is not tenable. Appellants testified rather freely as to why they were there; that Quigley was willing to receive a committee of five but not of ten, and that the fracas started when they insisted on the larger

committee being heard at once. Assuming the letter states a rule, it does not vest in the associations or organizations of relief applicants the right to dictate the time of conferences nor the size of committees or groups to represent them. The evident purpose of such set-up was to effect orderly procedure in treating general matters so that a policy could be worked out and the directors and employees of the Relief Administration, whose time is limited, would not be under the necessity of interviewing each of several hundred members on relief rolls as to the policies pursued, general needs, and methods of operation to best serve the needs and necessities of the groups as a whole. The court specifically instructed the jury that appellants had the right to assemble at Relief Headquarters, make protests and petition for redress in peaceable ways. That is all they contend for and all they had a right to contend for, in court or out of it.

Complaint is next made that the district attorney was permitted to cross-examine appellant, Sinclair, as to whether he was a citizen of the United States. Such matters were immaterial and irrelevant to the issues involved. It in no way tended to contradict, explain or modify any testimony he had given in chief. It touched upon matters which in no way affected the credibility of the witness or the weight of his testimony. He would not be subject to impeachment upon it. The objections thereto should have been sustained, although the evidence was immaterial and not prejudicial.

We come now to the last serious point presented on this appeal. During the cross-examination of Nason, a witness called by appellants, the district attorney interrogated him about his testimony at the former hearing, reading from the reporter's transcript of that proceeding. At the conclusion of the examination the district attorney offered in evidence certain parts of the transcript of the former trial, containing the questions about which he examined the witness, Nason for purposes of impeachment. The offer was made

by identifying certain pages and lines, which were ordered received in evidence over appellants' objections. The parts so received were not read into the record or to the jury except as they had previously been read to the witness during his cross-examination. The court then stated: "The court will indicate that in so far as the transcript is concerned, the court will give the jury the proper instructions as to the volume, so that the defendants will be protected against the use of the whole transcript by the jury. I think it might be even better if counsel would stipulate that those pages could be removed from the transcript and offered as an exhibit rather than have the whole transcript go to the jury room. It is rather bulky." And then after some colloquy between counsel and the court, the following occurred:

"The Court: Do you want the statute read to you?

"Mr. Metos: I have read it but I don't think it applies in this case, but to take the testimony of one witness out and give it emphasis over testimony of other witnesses—

"The Court: That isn't the purpose of the offer, Mr. Metos. There is no necessity in arguing the matter, Mr. Metos. You are in error on your position, and I am merely suggesting a practical manner in which to present this to the jury, but if you so desire, the whole record and the certificate will go in for the purpose of having the jury consider the testimony appearing on those pages, and those pages alone, and the jury will be admonished that they are not to read any portion of the transcript other than those pages received in evidence.

"I will even go this far: I will have the clerk attach a small memorandum, if there is no objection, as to the pages so that they may be indicated for the purpose of examination by the jury in the jury room.

"I think, however, the system I indicated is much more simple.

"Mr. Metos: I appreciate that, and I don't want to appear obnoxious about this matter, but I feel it is improper.

"The Court: The authorities are against you, Mr. Metos, because the statute is controlling."

And later, after all other evidence was concluded, the following occurred:

"The Court: Mr. Metos, when I admitted into evidence certain portions of the transcript of the former case I said that I would have the clerk prepare slips indicating the pages and lines to which the jury

is to pay attention. We have the slips prepared, and I would like to ask if you will consent that the slips go to the jury room?

"Mr. Metos: Yes, I will.

"The Court: Gentlemen of the jury, the court directs your attention to the pages and lines which you are to read, and the court instructs you not to pay attention to any other portion of the transcript."

Nothing further was said or done about the matter, and the entire transcript of the former trial (812 pages), with the slips showing the pages and lines, was taken by the jury to the jury room during their deliberations with the exhibits, instructions, and forms of verdict. Appellants assail this procedure insisting it was error to receive in writing parts of the testimony of Nason, and also to permit the whole transcript of all the testimony, proper and improper alike, of the former trial to be given to the jury during their deliberations. The situation presents two questions: (a) Was it error to permit the particular lines and pages to be taken to the jury room in writing or should they merely have been read into the record? (b) If not, was it error to permit the entire transcript to be taken to the jury room?

That the testimony given at a former hearing of the cause by a witness may be used to impeach him or to test his credibility is elemental. It may even be used as evidence in chief in any subsequent trial of the same cause, in the event the witness is deceased, or beyond the jurisdiction of the court. Revised Statutes of Utah 1933, Sections 104-51-16; 105-45-3; *State* v. *Gorham,* 93 Utah 274, 72 P. 2d 656. But such testimony, even though taken by a reporter, transcribed, and certified, is not documentary evidence to be received in writing and given to the jury. The statute provides:

"104-51-16. Whenever in any court of record the testimony of any witness in any case shall be stenographically reported by any official court reporter, and thereafter the witness shall die, or be beyond the jurisdiction of the court in which the cause is pending, either party to the record *may read in evidence the testimony of the witness,* when duly certified by the reporter to be correct, in any subsequent trial of, or proceeding had in, the same cause, subject only to the same

objections that might be made if the witness were upon the stand and testifying in open court." (Italics added.)

Section 105-45-3 is identical in language. So too our statutes with respect to depositions of witnesses taken outside the state and depositions taken within the state, whether under commissions to perpetuate testimony (Chapter 52, Title 104, Revised Statutes of Utah 1933), or under the provisions of Section 104-51-7, relative to depositions of witnesses within the state. The statute (Sections 104-51-11 and 104-51-7, Revised Statutes of Utah 1933) reads:

"When a deposition has been once taken it may *be read by either party* in any stage of the same action or proceeding, or in any other action between the same parties, upon the same subject, and is then *deemed the evidence of the party reading it.*" (Italics added.)

It is evident therefore that under the statutes such written testimony is not to be read by the jury in the jury room but is to be read to them in open court, subject to all objections to be made, the same as if the witness were present and testifying. The written record thereof should not be taken to the jury room where the jury might read it. A written instrument, made an exhibit in the cause but not consisting of testimony of a witness in the case, may of course be taken to the jury room the same as maps, diagrams, and other exhibits. But the testimony of a witness is in a different category. Such is the provision of the statutes and the common law always excluded depositions and written testimony from being carried from the bar by the jury. We can see no reason why the court should depart from the well established rule. It may often happen that the testimony on one side is oral from witnesses produced before the jury, while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the mem-

ory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony? *State* v. *Moody,* 18 Wash. 165, 51 P. 356; *Welch* v. *Insurance Company,* 23 W. Va. 288; *Tabor* v. *Judd,* 62 N. H. 288.

That it was error to permit any part of the transcript used in impeaching the witnesses to be taken to the jury room in writing is plain and unequivocal.

From what has been said it is plain that upon the record here presented, the judgment must be reversed and the cause remanded to the District Court for a new trial.

Such is the order.

MOFFAT, C. J., and WOLFE, McDONOUGH, and PRATT, JJ., concur.