No. 42,065

THE STATE OF KANSAS, *Appellee*, v. EARL WILSON, *Appellant*.

(360 P. 2d 1092)

Opinion filed April 8, 1961.

*Kenneth Ray*, of Kansas City, Kansas, argued the cause and was on the briefs for the appellant.

*Robert J. Foster*, county attorney, argued the cause, and *William M. Ferguson*, attorney general, *Robert Hoffman*, assistant attorney general, *James P. Davis*, assistant county attorney, and *James B. Flack*, assistant county attorney, were with him on the briefs for the appellee.

The opinion of the court was delivered by

WERTZ, J.: The defendant (appellant), Earl Wilson, David McCleveland and Eugene Artry were jointly charged in three separate counts of an information: Count one was kidnapping the complaining witness, Connie Porting, and inflicting bodily harm upon her in violation of G. S. 1959 Supp., 21-449; count two was forcible rape upon Connie Porting (G. S. 1949, 21-424), and count three was assault upon her with intent to kill. At defendant's request a severance was had. He was separately tried and convicted of kidnapping in the first degree, and the jury, under the provisions of section 21-449, fixed his punishment at death. He was also convicted of forcible rape, and of inflicting great bodily harm on, or

endangering the life of, Connie Porting in violation of G. S. 1949, 21-435.

Defendant's motion for a new trial was overruled and the verdict of the jury was approved by the trial court. Defendant was sentenced to be hanged on the kidnapping count, was sentenced on the second count to imprisonment for not less than five nor more than twenty-one years, and on the third count to imprisonment for not less than one nor more than five years. This court ordered a stay of execution (G. S. 1949, 62-2414) pending termination of his appeal.

It may be stated that we are neither authorized nor have we any disposition to debate the question of the wisdom of capital punishment. The legislature determines the policy of the state in that regard and enacts statutes which the courts are bound to follow. (*State v. Miller,* 165 Kan. 228, 194 P. 2d 498; *State v. Andrews,* 187 Kan. 458, 357 P. 2d 739.)

At the outset, it should be stated that the defendant, in his oral statement to law-enforcing officers and in his signed question and answer statement and/or confession, admitted his participation in the kidnapping and forcible rape of the complaining witness and in the infliction of great bodily harm upon her. However, he denied that he personally committed rape or inflicted bodily harm upon her.

In order to give adequate consideration to the questions raised on appeal in this case, it was necessary for this court to obtain a transcript of the testimony taken at the trial in the court below. A brief review of the record as disclosed by the transcript follows: At approximately eight o'clock on the evening in question, David McCleveland, Eugene Artry and Earl Wilson, the defendant (appellant), were riding around Kansas City in a Chevrolet automobile driven by defendant. All three men were in the front seat. After drinking one quart of wine, they pawned defendant's topcoat for three dollars to purchase a second quart and continued driving around the city. At approximately 11:00 p. m., the defendant parked the automobile at the end of a Kansas City bus line, near a drug store and liquor store. At that time the bus stopped and the complaining witness, Connie Porting, an unmarried girl seventeen years of age, got off and proceeded across the street, behind the car in which the three men were sitting. Connie started running and some remarks regarding why she was running were made by the defendant and his two companions. A decision was made by the

three of them to "get her." Connie lived a block and a half from the bus stop. She ran toward her home, and defendant started the automobile and followed her. Connie ran into the yard of a friend near the street corner and hid behind a high hedge. Losing track of her, they turned down the next street, thinking she had proceeded in that direction. Connie, in her belief that she could run home before the defendant and his companions encircled the block, started running south on 33rd street.

As Connie passed the corner and ran through the intersection, one of the three men got out, grabbed her and forced her into the front seat of the automobile. Connie was screaming and kicking. Porch lights went on in the neighborhood. Defendant and the other two men, in fear, raced from the scene, and after they had driven some distance Connie was pulled over into the back seat by Artry. McCleveland then climbed back into the front seat with defendant. Connie continued kicking and screaming, and defendant and his two companions continued beating and hitting her in an effort to keep her quiet. There was a sheet of some sort in the back seat and this was placed over her head and she was forced down in an attempt to hide her and keep her quiet and to prevent her from attracting attention. She was also blindfolded. While still in the car they removed Connie's underclothes and skirt and continued to beat and strike her.

The defendant continued driving and stopped first at a dark place on the railroad tracks. The three men were afraid, however, that Connie's screams would be heard, so defendant continued driving until he reached highway No. 32 and then drove until he got to a dark street, ending up at a place beyond the city dump, where defendant was employed. The three men were familiar with that part of the community. They came across a basement which appeared to be a foundation put in with the intention of later completing a house. There was lumber and construction material there. Defendant backed the automobile down near the foundation and Connie was dragged from the car ( all her clothing had by then been removed ), and she was taken into the basement, where she was horribly beaten and horribly raped.

The defendant stated to officers, both orally and in writing, that Artry pulled Connie out of the car and took her into the basement and McCleveland followed them later; that he (defendant) entered the basement some twenty minutes thereafter and saw Artry stand-

ing over the girl and McCleveland at her side; that Connie had nothing on and was lying on the ground; that Artry held a razor to Connie's throat and threatened to kill her, and that he also hit and slapped her about the face; that about three hours later the three men left Connie, naked, in the basement and "started up the hill," whereupon Artry said he had forgotten something and returned to the basement, remaining with the girl approximately ten minutes more. Then the three men again drove away, leaving Connie lying on the ground.

As defendant and his companions crossed a bridge over the Kansas river they stopped and threw Connie's skirt, gloves and billfold into the water. Defendant then drove to "the bottoms," where they purchased another quart of wine. The razor was thrown out of the window of the car and was later recovered by officers on information furnished by defendant.

Connie Porting testified, in addition to many of the facts heretofore related, that on the night in question, after she had gotten off the bus at the end of the line, she was grabbed by Eugene Artry and forced into the car driven by the defendant and was struck several times in the head and choked; that she was struck by the defendant while in the front seat of the car and after she was dragged from the car, and was raped by him. (Connie was later discovered and taken to a hospital.)

Doctor Nash, a gynecologist, examined Connie early the next morning in the hospital. He testified that the right side of her face was badly beaten and swollen; that she had a very black eye, her nose was bruised and her lower lip was cut considerably, primarily on the inside of the mouth; that her face was extremely swollen and the right side from her eye clear down into her throat, in addition to the swelling, was completely blackened; that the right side of her throat was swollen to the extent that it was almost continuous with her jawline, straight down to her shoulder and was also black and blue, and that there was practically no area on her body that didn't show evidence of either scratches or bruises. The doctor further testified that the lips of the vagina were swollen and, so far as discoloration was concerned, they were almost as bruised as her face; that the hymenal ring was torn in fifteen to twenty places and was stretched and bruised; that at the time he examined her she had ceased any bleeding from it but the slightest touch would make the torn areas bleed again; that the trained technician's

report showed the fluid in the vagina "was loaded with spermatozoa," or male germ cell, and that the presence of the spermatozoa and the condition of the hymenal ring showed actual penetration which had happened within the last twelve hours.

No useful purpose would be gained in relating the other horrid details which occurred on the night in question. Defendant's full and complete statement and confession was introduced in evidence, with his consent, as a part of the state's case, and he offered no evidence in his own behalf. The case was submitted to the jury under instructions to which there was no objection.

The county attorney, in his closing argument to the jury, made, among other statements, the following:

"Mr. Ray says these boys did not kill the complainant. In one sense of the meaning of the word 'kill', perhaps they did not. In another sense, I wonder. Let me quote from George Sokolsky, a syndicated columnist, who writes for newspapers over the nation, his column appearing in the Kansas City Kansan, which was printed on February 29th, just past, dealing with the Chessman case, and I quote:

"Mr. Ray: I object to bringing the Chessman case into this.

"The Court: Just a minute, now. What is your objection?

"Mr. Ray: I don't know what is coming here. It's something on the Chessman case, and certainly, the Chessman case is controversial, and I object to it.

"Mr. Foster: If the Court please, this statement has nothing to do with that at all.

"Mr. Ray: I don't know what it says—

"Mr. Davis: We ought to get it straight. The defendant read from the Baptist and other religious conventions and various things along that line.

"The Court: There is one difference: There was no objection.

"Mr. Davis: Well, we wanted to read from it, and we will read from some others, too, if you will open the door for it.

"The Court: The jury will keep in mind this is not evidence the attorneys are giving you. It is their argument in persuading or trying to persuade you as to their theory of the case. I guess I'll have to let him go ahead; I don't know what's coming.

"Mr. Foster: (Reading) 'The mother of a raped girl recently was quoted as saying, "My daughter was only seventeen when she was kidnapped. Her clothes were torn off and for hours she was terrified; she was abused, and caused her to lose her mind and life among normal human beings.'

"Miss Porting—Connie—has recovered to a great extent. Miss Porting will, in time, be perfectly normal again, thanks to the wonderful family she has; thanks to her belief in God; thanks to the wonderful people of this town in which she lives. . . .'"

The jury retired to deliberate upon their verdict. Shortly thereafter, and on the same day, they sent a note to the court requesting that the testimony of three of the eighteen witnesses (Connie

Porting, Lieutenant Grable and Leona McCleveland) be read to them. After the testimony of Leona McCleveland and Lieutenant Grable was read to the jury by the court reporter, the trial court stated:

"THE COURT: Do counsel have any objection to them taking a transcript of Connie Porting's testimony? Is that a complete transcript, Charley?

"COURT REPORTER: That is a complete transcript of the testimony of the witness Connie Porting. .

"MR. FOSTER: For the record, that is an accurate transcript?

"COURT REPORTER: That is an accurate transcript.

"THE COURT: The jury may, then, take it along as being the desired testimony of the witness, Miss Porting. Does that answer your question now, Mr. Foreman?

"FOREMAN OF THE JURY: Thank you, Your Honor."

The transcript of the testimony of Connie Porting was allowed to stay with the jury for the "second and third days of deliberation."

The jury commenced their deliberations on Friday, March 11, 1960, at 1:29 p. m., were excused at 5:10 p. m., reconvened Saturday, March 12 at 9:30 a. m., and at 3:00 p. m. were excused until 9:30 a. m., Monday, March 14, when, at 10:08 a. m., they returned their verdict. In other words, the jury were allowed to separate for some forty-one hours.

Defendant first contends the trial court erred in permitting the county attorney, in his closing argument, to read from an article written by Sokolsky concerning the Caryl Chessman case, recently appearing in the daily newspaper, which the county attorney and the court well knew at the time was one of the most controversial, both nationally and internationally, cases of the day. It is defendant's contention that the mere mention of the Chessman case, together with the quotation from Sokolsky, led the jury to believe that Connie Porting was losing or had lost her mind, when there was no evidence to sustain such assumption.

Our examination of the evidence reveals that the article was neither offered nor received in evidence; that there was no evidence to indicate that Connie was losing or had lost her mind or that her mind was affected by reason of her terrible experiences on the night in question. The argument can only be deemed an appeal to prejudice and passion and an attempt to introduce facts not disclosed by the evidence. It was extremely improper and prejudicial to defendant's rights. The court's order overruling counsel's objection to the argument put the court's stamp of ap-

proval on the state's argument and reasoning and the purported facts therein stated.

It is the duty of the county attorney in a criminal prosecution to see that the state's case is properly presented with earnestness and vigor, and to use every legitimate means to bring about a just conviction, but he should always bear in mind that he is an officer of the court and, as such, occupies a quasi-judicial position whose sanctions and traditions he should preserve. When a prosecuting attorney persists in objectionable argument, as in the instant case, then the court may, and should, declare a mistrial or grant a new trial. (*State v. Majors,* 182 Kan. 644, 647, 648, 323 P. 2d 917.)

Long ago, in *State v. Baker,* 57 Kan. 541, 46 Pac. 947, is was said:

"Where the county attorney in his closing argument to the jury repeatedly uses abusive and improper language calculated to create prejudice against the defendant, and the court, after objection made, fails to check him or to instruct the jury to disregard his remarks, the defendant is entitled to a new trial."

See also *State v. Ryan,* 141 Kan. 549, 553, 42 P. 2d 591; 88 C. J. S. Trial § 202, p. 401.

In an even earlier case, *State v. Gutekunst,* 24 Kan. 252, it was stated:

"We take this opportunity, however, of calling attention to the duty of the district courts in jury trials to interfere in all cases of their own motion, where counsel forget themselves so far as to exceed the limits of professional freedom of discussion. *Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case,* it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion." (Emphasis supplied.)

To the same effect, see *State v. Netherton,* 128 Kan. 564, 279 Pac. 19.

The primary purpose of argument by counsel is to enlighten the jury so that they may render a correct verdict, and counsel should not go beyond the scope of legitimate argument, and *his arguments must be confined to the law and the evidence in the case under consideration.* Counsel may indulge in impassioned bursts of oratory, or what he may consider oratory, as long as he introduces no facts not disclosed by the evidence. (88 C. J. S. Trial § 169, p. 337.) In summing up a case before a jury, counsel may not introduce or comment on facts outside the evidence. (*State v. Lopez,* 182 Kan. 46, 50, 318 P. 2d 662; *State v. Alexander,* 89 Kan. 422, 428, 131 Pac. 139.) The objectionable argument by the county attorney tran-

scends the limits of fair discussion of the evidence, and the over-ruling of defendant's timely objections thereto constituted prejudicial error.

Defendant contends that the trial court erred in allowing the transcript of the testimony of Connie Porting, the complaining witness, to be taken to the jury room and kept throughout the jury's deliberations.

This precise point has not been decided by this court. Defendant cites no authority to sustain his contention and the state cites none to justify the trial court's action. In our limited time for research we found the question had been passed upon in other jurisdictions. The action of the trial court in sending the transcript of the evidence to the jury appears to be without precedent. It is generally held, sometimes under statutory authority, that where the jury, after retirement, return to court with a request for information regarding the evidence on an important point as to which they are in doubt, the trial court may, in its discretion, permit the jury to have the testimony of a certain witness read to them (89 C. J. S. Trial § 479, p. 126).

In *State v. Solomon et al.*, 96 Utah 500, 509, 510, 87 P. 2d 807, the court, in a criminal case charging defendant with participating in a riot, after stating that it was in the trial court's discretion to permit most written instruments introduced as exhibits, such as diagrams, maps, et cetera, to go to the jury, said:

"But the testimony of a witness is in a different category. Such is the provision of the statutes and the common law always excluded depositions and written testimony from being carried from the bar by the jury. We can see no reason why the court should depart from the well established rule. It may often happen that the testimony on one side is oral from witnesses produced before the jury, while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room. Why should a witness be permitted to go there in the form of written testimony? *State v. Moody*, 18 Wash. 165, 51 P. 356; *Welch v. Insurance Company*, 23 W. Va. 288; *Tabor v. Judd*, 62 N. H. 288."

In *Commonwealth v. Ware*, 137 Pa. 465, 479, 20 Atl. 806, it is stated:

"The second assignment alleges that the trial was unlawful and irregular because the court did not, at the request of the jury, send out to them the testimony of Joseph Louden, to settle a disputed point in regard to what he had testified to. This assignment cannot be sustained. It would have been a mistake to send out his testimony. If the jurors had desired information as to any matter of fact or question of law, they could have come into court and stated their difficulty to the trial judge. He would have answered their inquiries, either as to the facts or the law. *The sending out of a part of the testimony to the jury room is without precedent, and would have been a palpable error.*" (Emphasis supplied.)

In *Payne v. State,* 199 Wis. 615, 629, 630, 227 N. W. 258, the court, in a murder prosecution where the jury had been permitted to take a deposition to the jury room, stated:

"While it is held that the matter of permitting exhibits to be taken to the jury room is a matter resting within the discretion of the trial court (*Wunderlich v. Palatine Fire Ins. Co.* 104 Wis. 382, 80 N. W. 467), attention should be paid to the nature of the exhibits. Generally there could be no harm in permitting a jury to refresh its memory with reference to the contents of a written instrument by an examination of the instrument. Where, however, the testimony bearing on one side of a controversy is in the form of a deposition or other written statement, and the testimony on the other resting entirely on parol evidence given in the court, it is obvious that to permit a jury to take the written portion of the testimony to the jury room, compelling them to rely upon their memories for the testimony on the other side, gives one side of the controversy an undue advantage, and it would seem plain that such exhibits should not be permitted to be taken to the jury room. 2 Thompson, Trials (2d ed.) § 2578."

We are of the opinion that when the court permitted the jury to take to the jury room the transcript of Connie Porting's evidence and to keep such transcript throughout almost all of their deliberation, such action placed undue emphasis on her testimony; in fact, it was equivalent to sending the complaining witness into the jury room, where she continued to plead her cause. Such action of the trial court amounted to prejudicial error.

It is next contended that the trial court erred in permitting the jury to separate for approximately forty-one hours after they had deliberated for two days.

Out of an abundance of caution, it is better practice to not permit a jury to separate during the trial of a capital case, but the court's allowance of such separation does not constitute reversible error, unless it is established that it tended to prevent a fair and due consideration of the case. (*State v. Howland,* 157 Kan. 11, 138 P. 2d 424; *State v. Haines,* 128 Kan. 475, 278 Pac. 767; *State v. Netherton,*

128 Kan. 564, 279 Pac. 19; *Odell v. Hudspeth* [Tenth Circuit], 189 F. 2d 300.)

In the instant case there is no showing that the separation was without the order or the permission of the lower court or that the jury was not properly instructed prior to separation. It is not shown that a request was made by the defendant or his counsel that the jury be kept together, nor is there any showing that such separation had any effect on the jury in reaching their verdict.

In view of what has been said, we are compelled to hold that the defendant was not afforded a fair trial guaranteed him by the federal and state constitutions. The judgment of the trial court is therefore reversed, with directions to set aside the verdict and grant the defendant a new trial.

It is so ordered.

PARKER, C. J., and PRICE and ROBB, JJ., dissent.