STATE of Utah, Plaintiff and Respondent,

v.

John Shepard DAVIS, Defendant and Appellant.

No. 18892.

Supreme Court of Utah.

June 25, 1984.

Ronald R. Stanger, Provo, for defendant and appellant.

David L. Wilkinson, Atty. Gen., Salt Lake City, for plaintiff and respondent.

HALL, Chief Justice:

This is an appeal from a third degree felony conviction of theft.[1] Defendant assigns the following as error: (1) insufficiency of the evidence; (2) denial of his motion to waive a jury trial; (3) admission of improper evidence during the State's rebuttal argument; and (4) inclusion of a partial written deposition in the evidence which the jury was permitted to take with them into their place of deliberation.

In 1978, Joseph Mascaro and Charley Joseph became investment partners for the purpose of purchasing options on two adjacent parcels of real property located in Utah County. While holding said options, Mascaro and Joseph (hereinafter the "partnership") initiated a sale of both parcels to Paul Tanner, who intended to develop the lots into a subdivision. Prior to the consummation of that sale, however, the term of the options expired and Tanner was able to negotiate a direct purchase on the larger of the two parcels (consisting of approximately 130 acres) from Stan Logan, the former owner thereof. The partnership was able to renew its option on the smaller

18-acre parcel, which it then exercised by purchasing the said parcel on uniform real estate contract for $117,000. Inasmuch as this smaller parcel provided access to the larger parcel purchased by Tanner, it was essential to Tanner's proposed development. Tanner therefore purchased the smaller parcel from the partnership on uniform real estate contract at a price of $165,000. He paid $40,000 down on the contract,[2] but was unable thereafter to obtain the necessary financing to pay off the $125,000 balance.

In December of 1978, defendant John Davis, an attorney, was hired by the partnership to collect the balance owing on the Tanner contract. During the initial meeting between defendant and the partnership, one of the matters discussed relative to the impending collection was that of attorney fees. Defendant indicated that his fee for the requested services would be between $9,000 and $12,000, depending upon the extent of the work involved. The partnership, however, countered with an offer of a flat fee of $20,000 to cover the collection as well as defendant's representation of the partnership in any connected litigation. The record does not reveal which fee proposal was ultimately agreed upon.

Defendant was successful in negotiating a settlement between the partnership and Tanner, whereby Tanner agreed to sell his interest in both parcels if the partnership could find another buyer before Tanner could obtain financing. This settlement agreement was reduced to writing and signed by the parties (i.e., Mascaro, Joseph and Tanner) on February 8, 1979. Soon thereafter, defendant was commissioned by the partnership to effectuate the resale of the property. According to the testimony of Charley Joseph, defendant was to be paid an additional $20,000 if he was successful in finding a new buyer and completing the resale transaction. That testimony

---

1. In violation of U.C.A., 1953, § 76–6–404.

2. The $40,000 received from Tanner was disbursed by the partnership as follows: $33,000 was paid as a down payment on the partnership's contract to purchase the 18-acre parcel;

$4,000 was paid to the real estate company handling the transaction; and the remaining $3,000 was split equally between Mascaro and Joseph.

was however contradicted by defendant, who testified that he had agreed to perform the said services in exchange for one-third of the total income derived from the transaction. The record does not contain any written documentation evidencing the parties' intentions with respect to attorney fees.

Less than a month and a half after the signing of the settlement agreement, defendant succeeded in negotiating a new sale of the subject property (both parcels) to Chatillion, Inc. (hereinafter "Chatillion") at a total price of $1,280,000. Since the said property consisted of two distinct parcels owned by different individuals (i.e., a 130-acre parcel owned by Stan Logan and an 18-acre parcel owned by the partnership), the sale was accomplished by executing a separate earnest money agreement between Chatillion and each of the owners. The agreement relevant to these proceedings is that between Chatillion and the partnership concerning the 18-acre parcel. That agreement provided that Chatillion would pay the partnership approximately $141,000 in cash and transfer to it property valued at $240,000.

A closing was held on June 5, 1979, at which time Curtis Baum, Chatillion's principal officer and stockholder, tendered to the partnership a check for $100,000,[3] as well as the deeds to eight building lots. The check was made payable to defendant in his capacity as attorney for the partnership and was deposited by defendant in his trust account, as per the directions of Charley Joseph. The building lots were rejected by the partnership because they were of insufficient value. As a result, Baum tendered deeds to another eight lots, but failed to deliver therewith an appraisal to substantiate their value.[4]

At trial Joseph testified that at the time the initial funds were received from Chatillion and deposited, he gave defendant specific instructions regarding the disburse-

ment thereof. Those instructions were as follows: (1) Joseph was to receive, and did receive on that particular occasion, a check for $20,000 to cover his expenses; (2) $30,-000 to $40,000 was to be applied toward the partnership's purchase of the 18-acre parcel from Shelby Taylor (original owner of the said parcel); (3) $25,000 to $30,000 was to be disbursed to Joseph Mascaro as his partnership share; and (4) an unspecified amount was to be reserved to cover closing expenses.

Also testifying in regard to the disbursement instructions was Curtis Baum, who claimed to have been present at the time the $100,000 was deposited by defendant and to have been privy to the conversations between defendant and Joseph concerning the appropriation of that money. His recollection of the instructions given defendant was identical to that given by Joseph (in his trial testimony), with only one exception: he thought he recalled the amount set aside for Mascaro as being $20,000 to $25,000, rather than $25,000 to $30,000.

Another witness who claimed to have been privy to the subject conversation between defendant and Joseph was George Robinson, an employee of the defendant's on the occasion so specified. Robinson's testimony in this respect was consistent with Joseph's in nearly every respect, the only variation being that he did not recall a specific dollar amount committed to Shelby Taylor; rather, he thought the instruction with respect to the Taylor obligation was that an unspecified amount (of the deposited funds) should be used to make a down payment on an apartment complex that would then be conveyed to Taylor in satisfaction of the partnership's obligation to him.

Defendant's version of the instructions given him as to the disbursement of the $100,000 was at variance with that adduced by the plaintiff through the testimonies of Joseph, Baum and Robinson, *supra*. He

---

**3.** The cash balance of $41,000 was to be paid within the following week. As will be shown *infra,* said payment was made in full, though perhaps not within the week after the closing.

**4.** Appraisals were to be delivered within a few days. The record does not show whether said delivery took place.

testified that Joseph's instructions were to apply the funds toward the retainer (i.e., allegedly a one-third contingency fee) and use them as needed at his (defendant's) own discretion.

Bank records produced at trial revealed that on June 5, 1979, prior to the recording of the $100,000 deposit, defendant's trust account registered an overdraft of $14.23. On June 18, 1979, less than two weeks after the said deposit was made, defendant's trust account registered an overdraft of $435.67. During that two-week period, only $25,903.64 from defendant's trust account was expended in connection with his work for the partnership;[5] the balance was spent on defendant's personal expenses.[6]

Over the period between June 25, 1979, and September 12, 1979, defendant received and deposited in his trust account on behalf of the partnership additional payments from Chatillion totalling $41,037.09. Of this amount only $21,854 was expended in connection with business of the partnership.[7] Thus, of the total $141,037.09 received from Chatillion and deposited into defendant's trust account, only $47,757.64 was spent in furtherance of partnership business, leaving a difference of $93,279.45.[8]

Despite Chatillion's satisfaction of the cash obligation on the 18-acre purchase, the sale of that parcel was never fully consummated because an agreement was never reached in respect to the value of the lots tendered by Chatillion. Also contributing to the failure to bring the sale to completion was the dispute that arose between the partners, Mascaro and Joseph, in November, 1979. The apparent cause of that dispute was that Mascaro had never received his share of the money paid by Chatillion. As a result, Mascaro, along with Shelby Taylor, who likewise had never received a payment out of the said funds, obtained other counsel and in May of 1980 brought suit to recover the sums allegedly owed them, naming as defendants Charley Joseph, Chatillion, Inc. (Baum), and the defendant herein, John Davis. Defendant represented himself and Joseph in that action. However, he did not file an answer to the complaint, and consequently a default judgment was entered against them. He then succeeded in getting the judgment set aside and was ordered to respond to the complaint within thirty days. Again, he failed to respond, and a second default judgment was entered. The trial court subsequently ordered defendant to withdraw as counsel because he was to be

---

5. The $25,903.64 figure was calculated on the basis of the following stipulated expenditures: (1) a $20,000 payment to Charley Joseph; (2) a $903.64 payment to Bitner Excavating in satisfaction of a debt owed by Joseph; and (3) a $5,000 payment to defendant's employee, George Robinson, for work done for the partnership.

6. The parties further stipulated that defendant's personal expenditures from the $100,000 included, *inter alia,* the following: (1) payment of $1,753.27 to Jones Paint & Glass for installation of a window at defendant's residence; (2) payment of $26,644.23 to Thorn, Inc., for accounts previously collected on behalf of Thorn, Inc.; (3) payment of $6,920 to L. Flake Rogers for back rent on defendant's office; (4) payment of $4,183.20 to Deseret Federal Savings for payments in arrears on defendant's home; (5) payment of $3,119.70 to M. Dayle Jeffs, an attorney, in settlement of a 1977 default judgment against defendant for unpaid credit card debts; (6) payment of $9,125 to F.M.A. Leasing for the lease of a 1974 vehicle and a Burroughs computer; (7) payment of $4,713.75 to Burroughs Corporation for updating the memory of defendant's computer; (8) payment of $6,530 to Provo 27th Ward as a charitable contribution; (9) payment of $1,432.46 to Meredith & Day on a student loan debt; (10) payment of $2,392.72 to Service Station Supply, Inc., for accounts collected on its behalf; and (11) payment of $1,325.81 to Utah Office Supply for accounts collected on its behalf.

7. It was stipulated that the $21,854 was spent as follows: (1) $18,000 was paid to Charley Joseph; (2) $2,500 was paid to George Robinson for work he performed for the partnership; (3) $1,000 was paid to Mountainland Realty; (4) $350 was paid to Aspen Engineering; and (5) $4 was paid to the Salt Lake County Recorder.

8. The State acknowledged defendant's possible entitlement to a $20,000 fee pursuant to the flat fee arrangement described at trial by Joseph and, therefore, charged defendant with the theft of only $73,279.45 rather than the full $93,279.45.

called as a witness by the plaintiffs (Mascaro and Brown).

On June 18, 1981, after the second default judgment had been entered against Davis (defendant) and Charley Joseph, Joseph Rust, attorney for plaintiffs Taylor and Mascaro, deposed defendant in connection with the continuing litigation between Rust's clients and Chatillion. At that deposition, defendant represented that he was still holding the monies received from Chatillion in his trust account, but refused to reveal the location of the trust account.[9] After the deposition, Charley Joseph, who had been present and had heard defendant make the foregoing representation, inquired of defendant as to where he was holding the money. Defendant purportedly replied that he had the money but did not have to tell anyone where it was.

Joseph subsequently filed a cross-claim against defendant and, at the suggestion of counsel, also filed criminal charges against him for theft. Defendant declined to answer the cross-claim because, as he later explained at trial, he did not want to prejudice his case in the present criminal matter. Consequently, Joseph obtained a default judgment against defendant in the amount of $180,000.

Attorney Rust petitioned the trial court for an order to require defendant to disclose information concerning his trust account. Several hearings were held on this matter, and finally an order was issued that defendant make full disclosure. As a result, defendant's bank records were obtained and it was discovered, contrary to what defendant had represented, that the funds received from Chatillion had been fully exhausted. As heretofore indicated, the records also revealed that the funds had been spent primarily in satisfaction of defendant's personal expenses.

The instant matter proceeded to trial on October 18, 1982. Defendant had made a motion before trial to waive his right to a jury trial, but his motion had been denied on the basis of a prosecution objection. The case was therefore tried before a jury, and defendant was found guilty of theft.[10]

## I. SUFFICIENCY OF THE EVIDENCE

Defendant contends that the evidence presented at trial was insufficient to support his conviction of theft. Under familiar rules of appellate review, we are constrained to view the evidence in the light most favorable to the jury's verdict and will only interfere with or overturn the verdict when the evidence is so lacking and insubstantial that a reasonable man could not possibly have reached a verdict beyond a reasonable doubt.[11]

To sustain a conviction of theft, the evidence must establish the following elements beyond a reasonable doubt: (1) that the defendant obtained or exercised unlawful control over the property of another (2) with a purpose to deprive him thereof.[12]

The underlying premise to defendant's claim of insufficiency of the evidence is the belief that his testimony provided the only reasonable and truthful account of the

9. That defendant made this representation was verified at trial by Joseph Rust, Charley Joseph and Brad Young (the court reporter who transcribed the deposition), all of whom were present at the June 18, 1981 deposition of defendant.

10. Defendant was sentenced to not more than five years in the Utah State Prison and fined $5,000. Both the sentence and fine were stayed, however, and defendant was placed on two years' probation on condition that he work one day a week for fifty weeks for the Utah County Sanity Administration and that he make restitution to the victims in the amount determined by the civil lawsuit on the same matter. Defend-

ant's conviction, although originally a second degree felony, was reduced at sentencing to a third degree felony.

11. See State v. Jones, Utah, 657 P.2d 1263 (1982); State v. Forsyth, Utah, 641 P.2d 1172 (1982); State v. Asay, Utah, 631 P.2d 861 (1981).

12. U.C.A., 1953, § 76–6–404. It is noted that in order for a theft conviction to be punishable as a second degree felony (as this one was), the requirements of § 76–6–412 must also be satisfied. The latter section was satisfied in this case by the parties' stipulation that the value of the property alleged to have been stolen exceeded $1,000.

events and circumstances precipitating this action and therefore all conflicting evidence should have been disbelieved and disregarded by the jury. Overlooked in this premise is the fundamental rule that the prerogative to judge the credibility of witnesses and evidence in general belongs to the jury. In *State v. Shonka,*[13] where the appellant made a claim similar to that made herein by defendant, this Court observed:

> What the defense argument overlooks is that the jury was not absolutely bound to believe all of the testimony of the defendant. It was their prerogative to give it only such weight as they thought it entitled to considered in the light of all of the facts and circumstances surrounding the occurrence, including the self-interest of the witness.[14]

To establish the first element of the offense, plaintiff had to show (1) that the money received from Chatillion actually belonged to the partnership, and (2) that defendant obtained or exercised unlawful control over that money.

As proof that the money belonged to the partnership, plaintiff offered the following evidence: Curtis Baum's testimony indicating his intention to pay the partnership with the money tendered to defendant and his perception of defendant's role with respect to the money as that of a mere conduit or intermediary; the check for $100,000 evidencing defendant's representative capacity by the fact that it was made payable to defendant not in a personal capacity, but rather as attorney for the partnership; and the testimony of both Joseph and the defendant to the effect that the money was deposited in defendant's account at Joseph's direction.

To prove the second half of this element (i.e., the exercise of unlawful control), plaintiff established first, through the testimony of Charley Joseph, Curtis Baum and George Robinson, that defendant received explicit instructions from Joseph to disburse the money received from Chatillion in the payment of partnership expenses.

Plaintiff then showed that of the $141,037.09 ultimately received from Chatillion, only $47,754.64 was disbursed as directed (i.e., on behalf of partnership expenses), while $93,279.45 was disbursed to satisfy defendant's personal obligations. Furthermore, plaintiff pointed out that while $20,000 of the $93,279.45 consumed by defendant was actually owed defendant by the partnership in attorney fees, defendant had only received authorization to take $6,000 toward his fee from the total received from Chatillion. As to the additional $20,000 offered defendant for arranging and transacting a new sale after the Tanner default, plaintiff pointed out that the sale had never been fully consummated and therefore the fee was not owing.

The only evidence offered by defendant to controvert plaintiff's proof on this first element of the offense was his own testimony relative to the agreement for attorney fees and the instructions for the disbursement of the money received from Chatillion. As heretofore indicated, defendant testified that he was to receive a one-third contingency fee for his services subsequent to the Tanner default. Inasmuch as the sale to Chatillion was worth approximately $381,000 to the partnership, defendant claimed that his portion was in excess of $100,000. He further claimed that the partners had agreed to take as their portion the real property traded by Chatillion (valued at $240,000). Thus, he maintained that the $100,000 received from Chatillion actually belonged to him.

Even had the jury accepted defendant's representation as to the fee arrangement, they would not have been justified in concluding that his appropriation of the money received from Chatillion as his fee was proper because, as plaintiff pointed out, defendant never consummated the services for which he was to receive the alleged contingency fee.

Defendant further testified that the instructions he received from Joseph relative

---

**13.** 3 Utah 2d 124, 279 P.2d 711 (1955).

**14.** *Id.* at 714.

to the disbursement of the money were that it should be applied toward defendant's retainer and used at his own discretion. Based on those instructions, he claimed that his expenditures were justified and did not constitute an exercise of unauthorized control.

■ Viewing the foregoing evidence in a light most favorable to the jury's verdict, we believe reasonable minds could believe beyond a reasonable doubt that the cash paid by Chatillion belonged to the partnership and that defendant's disbursement of that cash to himself for his own purposes constituted unauthorized control.

■ As to the second element of the offense, to. wit: intent to deprive, it is well-settled that such need not be proved by direct evidence, but may be inferred from the defendant's acts, conduct, statements or from the circumstances.[15] According to plaintiff, the most salient evidence in this regard is as follows: Defendant twice failed to enter responsive pleadings in the civil action brought against himself, Joseph and Chatillion by Taylor and Mascaro, apparently to avoid being compelled to give an accounting of the money deposited in his trust account. Furthermore, he subsequently represented under oath at the June 18, 1981 deposition that he was still holding the money in his trust account, although bank records established that he had in fact expended the money nearly a full year earlier. Plaintiff contends that this evidence, combined with that set forth above relative to defendant's appropriation of the money, establishes beyond a reasonable doubt defendant's "intent to deprive."

Again, defendant urges that his testimony at trial that he honestly believed he was entitled to the money as his fee was suffi-

cient to negate plaintiff's evidence (above) respecting the element of intent. The jury, however, whose prerogative it is to weigh such evidence, did not countenance defendant's position, and neither do we.

■ This is not the first time this Court has found "intent to deprive" under circumstances such as are existing here. In *State v. Shonka, supra,* this Court ruled that the evidence that defendant admitted taking the money, failed to record it or report it to her supervisors, failed to disburse it in the proper manner, and refused to permit an audit of her personal accounts was sufficient to support the jury's finding of intent to steal. By comparison, in the instant matter, defendant admittedly appropriated most of the money for his own use, failed to report such appropriation to the partnership, failed to follow the disbursement instructions given him by Joseph and avoided revealing the location of his trust account and the nature of the expenditures. We hold, as did the Court in *Shonka,* that the evidence so stated constitutes a sufficient factual foundation from which reasonable minds could infer that defendant took the money with the intent to deprive the partnership thereof.[16]

## II. RIGHT TO WAIVE A JURY TRIAL

Defendant's second assignment of error is in respect to the trial court's denial of his motion to waive a jury trial. He claims that the court's ruling in this regard abrogated his constitutional right to an impartial trial.[17] We do not agree.

We addressed the instant issue most recently in the case of *State v. Studham.*[18] We determined therein that the trial court had not erred in denying the defendant's motion to waive his jury right. The ration-

---

**15.** *State v. Murphy,* Utah, 674 P.2d 1220 (1983); *State v. Kennedy,* Utah, 616 P.2d 594 (1980).

**16.** *Supra* note 13, at 714.

**17.** Pursuant to the guarantees set forth in Article I, Section 12 of the Utah Constitution, to wit:

> In criminal prosecutions the accused shall have the right ... to have a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed ....

**18.** Utah, 655 P.2d 669 (1982).

ale applied in reaching that determination is dispositive here:

> Although an accused is guaranteed a right of trial by jury, neither the state nor the federal constitution guarantees him a right to "waive" a jury trial. On the contrary, Federal Rule 23(a), Criminal Procedure, and its counterpart, U.C.A., 1953, § 77–35–17,[19] both allow such waiver only by the court's approval and the consent of the prosecution.[20]

■ In the instant case, neither the court nor the prosecution consented to the proposed waiver. Furthermore, the record is devoid of any indication that defendant was denied a fair trial as a result of the case being tried to a jury. We therefore hold that the trial court's denial of the requested waiver did not interfere with defendant's constitutional rights.

## III. REBUTTAL EVIDENCE

Defendant next assigns error in the admission of a written excerpt of his June 18, 1981 deposition as rebuttal evidence. The circumstances out of which this alleged error arose are set forth hereafter.

During the presentation of its case-in-chief, plaintiff called upon Charley Joseph to testify concerning a response given by defendant at his June 18, 1981 deposition (to which Joseph had been privy) to the question as to whether defendant still had the money received from Chatillion in his trust account and, if so, where that account was located. Defendant's response to that question, as Joseph recalls it, was that the money was still in the account, but that he did not have to reveal the location of the account or anything further concerning it.

At that point in the trial proceedings, plaintiff moved to have the corresponding portion of the written deposition admitted into evidence as an exhibit. The trial court, however, expressed its view that such an admission would be duplicative in light of Joseph's testimony; whereupon, defendant made an objection to that effect which was sustained.

During plaintiff's subsequent cross-examination of defendant, defendant was asked to verify his deposition statement. His initial response was that he did not recall being asked the question or having answered it as Joseph had represented. After being shown the deposition to refresh his memory, he then claimed that he had misunderstood the question at the time it was asked (i.e., June 18, 1981) and that his answer had been clarified at a later deposition taken in September, 1981.[21]

Considering defendant's statements on cross-examination with regard to the status of the trust account at the time the June deposition was taken inconsistent with his representations in that same regard in the deposition, plaintiff called Brad Young, the court reporter who took the June deposition, as a rebuttal witness. Young verified the accuracy of the deposition and added his independent recollection of defendant's statement. At that point, plaintiff again moved to have the written excerpt from the deposition containing defendant's statement admitted as an exhibit corroborating Young's rebuttal testimony. Defendant interposed an objection to its admission on grounds that it did not constitute a prior inconsistent statement. The court ruled that it was the equivalent of a prior incon-

---

**19.** This section provides, in pertinent part:
> (c) All felony cases shall be tried by jury unless the defendant waives a jury in open court with the approval of the court and the consent of the prosecution.

**20.** *Supra* note 18, at 671. *See also State v. Black,* Utah, 551 P.2d 518, 520 (1976); *Singer v. United States,* 380 U.S. 24, 85 S.Ct. 783, 13 L.Ed.2d 630 (1965).

**21.** The portion of the September 23, 1981 deposition that purportedly clarified the response in the earlier June deposition was read into the record as follows:
> Q. Am I to understand that you did not understand the question at that time?
> A. Well, apparently not. I have since answered as required by the Court. I answered regarding the trust account at that time and I indicated that the trust account had been closed out.

sistent statement and could be admitted as "an initial question of fact for the jury to determine." Defendant made no further objection, and the evidence was admitted as Exhibit P–1.

■ Defendant contends on appeal that evidence that goes to "an initial question of fact" can only be presented as part of the case-in-chief. He did not, however, base his objection to the admission of Exhibit P–1 on those same grounds at trial. Rather, his objection there was limited to the exhibit's admission as a prior inconsistent statement, which basis he apparently abandons on appeal. Rule 4 of the Utah Rules of Evidence provides:

> A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless (a) there appears of record objection to the evidence timely interposed *and so stated as to make clear the specific ground or objection* . . . .

(Emphasis added.) In light of this rule, we hold that defendant's present assertion of error in respect to the admission of Exhibit P–1 is precluded.

## IV. THE USE OF DEPOSITIONS IN JURY DELIBERATIONS

Defendant's final assignment of error is in respect to the trial court's permitting the jury to take Exhibit P–1 (a partial deposition) with them into their place of deliberation. He argues that in so doing, the court violated Rule 17 of the Utah Rules of Criminal Procedure (U.C.A., 1953, § 77–35–17(k)) which provides in pertinent part:

> (k) Upon retiring for deliberation, the jury may take with them the instructions of the court and all exhibits and papers which have been received as evidence, *except depositions;* and each juror may also take with him any notes of the testi-

mony or other proceedings taken by himself, but none taken by any other person. (Emphasis added.)

Plaintiff's rejoinder to this argument is that there is nothing in the record that even suggests that Exhibit P–1 went with the jury into deliberation and therefore the defendant has failed in his burden of showing error.

■ In the absence of any indication in the record to the contrary, we assume that all evidentiary exhibits were sent with the jury into deliberation. Such an assumption is appropriate here. We therefore conclude that error was committed as assigned by defendant.

Our conclusion in this regard comports with decisional law in this as well as other jurisdictions. In *State v. Solomon*,[22] this Court held that it was error to permit a portion of a witness's transcript to be taken to the jury room, reasoning as follows:

> It is evident therefore that under the statutes such written testimony is not to be read by the jury in the jury room but is to be read to them in open court, subject to all objections to be made, the same as if the witness were present and testifying. The written record thereof should not be taken to the jury room where the jury might read it. A written instrument, made an exhibit in the cause but not consisting of testimony of a witness in the case, may of course be taken to the jury room the same as maps, diagrams, and other exhibits. But the testimony of a witness is in a different category. Such is the provision of the statutes and the common law always excluded depositions and written testimony from being carried from the bar by the jury. We can see no reason why the court should depart from the well established rule. It may often happen that the testimony on one side is oral from witnesses produced before the jury,

---

22. 96 Utah 500, 87 P.2d 807 (1939). *See also State v. Wilson*, 188 Kan. 67, 360 P.2d 1092 (1961); *State v. Payne*, 199 Wis. 615, 227 N.W. 258 (1929); *Shedden v. Stiles*, 121 Ga. 637, 49 S.E. 719 (1905).

while the testimony for the other side on essential matters is in the form of depositions or in the transcript from testimony at a previous hearing. If the hearing lasts for any length of time and the jury takes the depositions or transcript to be read and discussed while the oral evidence contra has in a measure faded from the memory of the jurors, it is obvious that the side sustained by written evidence is given an undue advantage. The law does not permit depositions or witnesses to go to the jury room.[23]

 While we are convinced of the commission of the asserted error, we are unable to find in the record any objection thereto. In the absence of a proper and seasonable objection, an error such as this will be deemed waived.[24] We hold, therefore, that defendant's failure to so object precludes assertion of this error.

Affirmed.

WE CONCUR:

STEWART, HOWE and DURHAM, JJ., and DEAN E. CONDER, District Judge, concur.

OAKS, J., having resigned, does not participate herein.

DEAN E. CONDER, District Judge, sat.

---

23. 87 P.2d at 811.

24. *See State v. Hofer,* 238 Iowa 820, 28 N.W.2d 475, 481 (1947); *Proctor v. State,* 235 Ga. 720, 221 S.E.2d 556, 558–59 (1975); *Shedden v.* *Stiles, supra* note 22; *People v. Dixon,* 37 Ill.2d 416, 226 N.E.2d 608, 610 (1967); *State v. Solomon, supra* note 22.