## JAMES SMITH v. STATE OF MARYLAND

[No. 281, September Term, 1968.]

*Decided April 23, 1969.*

*Robert H. Reinhart* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Donald W. Mason, State's Attorney for Allegany County,* and *Paul J. Stakem, Assistant State's Attorney for Allegany County,* on the brief, for appellee.

THOMPSON, J., delivered the opinion of the Court.

James Smith, the appellant, was convicted of carnal knowledge of a female child under the age of 14 years by a jury in the Circuit Court for Allegany County. The presiding judge, James S. Getty, imposed a sentence of life imprisonment.

About 4:30 p.m. Smith drove a stolen automobile to the residence of his daughter who lived in a low rent housing development in the City of Cumberland, Maryland, known as Fort Cumberland Homes. After visiting with his daughter for a short

time, Smith took three of his grandchildren and several other children for a drive. While riding about the city he stopped and purchased soft drinks and confections for the children and returned to Fort Cumberland Homes at about 5:45 p.m. After all of the children, except his granddaughter, Jayma Lee Hamilton, who was then four years of age, exited from the vehicle, he drove away.

About 9:30 p.m. Smith returned the young girl to the apartment of Ruth Rhodes, his daughter's neighbor. After the girl's father carried her from the car into his house, he discovered that her hair was messed and her dress unbuttoned. He also noticed blood on her underpants. He testified that she was bleeding "between the legs." The mother soon returned to the residence, and the child was taken to Memorial Hospital by her mother and Ruth Rhodes, arriving there at 9:30 or 10 o'clock p.m. The child was calm at the hospital and one examining doctor characterized her demeanor as "placid." The victim was examined by Dr. Leland B. Ransom and Dr. John A. Topper, both of whom took specimens for laboratory analysis. Dr. Topper testified that two specimens were taken of the exterior of the female sexual organ by the use of glass slides and one specimen was taken in the vaginal area by use of a swab. Because of the way this latter specimen was obtained, the examining physician admitted the possibility that the material discovered by laboratory analysis came from the exterior rather than the interior of the victim. He explained that he had used a swab instead of a sucking technique through a tube because he felt that such examination at that time might have further injured the victim. Upon analysis of the specimens taken, Dr. Lester Kiefer, a pathologist, testified to the presence of male spermatozoa and male acid phosphatase on all slides. Dr. Ransom's examination showed that Jayma needed surgical attention, and she was taken to the operating room, anesthetized, and treated for her injuries—a laceration described as similar to that found after the birth of a baby in an adult female, required three sutures to close. The doctor stated "the wound was caused by something that either entered or exited the vagina, and since the patient wasn't pregnant, I presume it entered." The doctor stated that some instrument could have been forced into the

vagina so as to have caused the laceration, but that a penis could have caused the tear.

After the child was treated by Dr. Ransom, her mother and Ruth Rhodes took her home, arriving there about 2:15 a.m. the following morning, January 18, 1968. The mother testified, over objection, as follows:

"Q. What did your daughter say, if anything, after she arrived back home?

"A. Well she went to the bathroom and she came downstairs and I gave her a sandwich, and she said that her grandfather had hurt her, she didn't like him any more and she did not want to ride with him any more. And there wasn't none of the other kids awake to talk to her.

"BY THE COURT: What was the last?

"A. None of the other children were awake to talk to her. They were all in bed. They hadn't seen her.

"BY THE COURT: Did you say anything to your daughter? Did you ask her any questions?

"A. No."

Cross examination revealed that the statement occurred under the following circumstances:

"Q. Now you say you left the hospital about 2:00 o'clock to bring the child home. Do you recall what time you got to the hospital?

"A. It was around 9:30, something of 10:00, 10:00 o'clock, I don't know. I didn't stop to look at my watch.

"Q. You didn't talk to the child at all on the way to or from the hospital, is that correct?

"A. No, while she was in the hospital and while we were going there I cried the whole way up and in the hospital. I didn't say anything to her.

"Q. You didn't try to find out from her what happened to her?

"A. No.

"Q. Not at all? Don't you think it's rather strange

that a mother whose child has been molested apparently, at least believes the child has been molested, wouldn't try to find out from that child what had happened to her?

"A. I wasn't interested in who done it. I just wanted to see her fixed and get better.

"Q. All right, well then you got her fixed at the hospital, on the way back home you didn't try to find out what had happened to her?

"A. No. I just asked her who hurt her and she wouldn't say anything.

"Q. It wasn't until four and a half hours after she went to the hospital that she told you the statements that you testified to here a few minutes ago?

"A. It was about fifteen minutes after I got her home from the hospital.

"Q. Well you testified it was about 2:15 or 2:30?

"A. That's right.

"Q. Did you suggest to the child it was grandfather that hurt her?

"A. I didn't mention his name to her."

The record discloses that these were the first words the child had spoken to anyone since Smith had returned her to her home.

The victim did not testify because the court had previously ruled that she was not a competent witness. Smith testified, denying the crime, and also many important details as testified to by other witnesses.

It is contended on appeal that the trial court committed error in denying a motion for judgment of acquittal because there was no sufficient evidence to show a penetration by a male sex organ into any part of the female sex organ. Assuming, without deciding, that penetration is necessary to support a charge of statutory, as opposed to common law rape, see *Scott v. State,* 2 Md. App. 709, 237 A. 2d 61, we cannot say that there was no legally sufficient evidence from which penetration could have been found beyond a reasonable doubt. *Williams v. State,* 5 Md. App. 450, 247 A. 2d 731. The medical evidence showed that the vagina of the victim was split by the insertion of some

object, which could have been a penis, and that spermatozoa were all around the area, and probably within the vagina as well. Proof of guilt is not required to a mathematical certainty. *Pettis v. State,* 2 Md. App. 651, 236 A. 2d 429.

In his argument, Smith relies upon the case of *Craig v. State,* 214 Md. 546, 136 A. 2d 243 in which a judgment was reversed by the Court of Appeals because there was no evidence of penetration. In that case the victim did not testify as to any penetration by the male sex organ but did tesify as to penetration by other parts of the body of the accused, and the injuries were entirely consistent with the testimony of the complaining witness. In addition, no spermatozoa were found on the victim. In the case at bar the most probable explanation of the injuries and conditions was the entrance of a penis within the vagina of the victim which is a distinguishing feature between the two cases.

Smith most strenuously contends that the trial court committed error in the admission of the testimony of the mother as to the statement of the child that "her grandfather had hurt her, she didn't like him anymore and she didn't want to ride with him anymore" after they had returned from the hospital which was some four or five hours after the victim had been returned by Smith to her residence. If the victim had testified in this case, the trial court's ruling would have been supported by *Legore v. State,* 87 Md. 735, 41 A. 60 wherein a prosecutrix complained to her husband immediately upon his return several hours after the occurrence, and the complaint was admitted. We think the analogy would have been particularly apropos because in both the case at bar and *Legore, supra* there was ample opportunity for the victim to make a complaint to others, and in each case the victim took advantage of the first opportunity to speak alone with the person to whom such a complaint would have been most likely made.

*Green v. State,* 161 Md. 75, 155 A. 164 and *Shoemaker v. State,* 228 Md. 462, 180 A. 2d 682 make clear that in Maryland a complaint by a rape victim is admitted as original evidence primarily to support the testimony of the victim as to the time, place, crime, and name of the wrongdoer. These and other cases indicate quite clearly, however, that in a proper case the

victim's complaint can also be a part of the *res gestae* and, of course, therefore admissible whether or not the victim testifies. See also 1 Wharton *Criminal Evidence* §§ 279, 294 (Anderson 12th Edition).

What constitutes *res gestae* includes what was said during the crime, *Hall v. State,* 5 Md. App. 599, 249 A. 2d 217 and, in addition, some things which are said thereafter as a direct and immediate result thereof. Although judges and legal writers have written many words to describe the latter, we think one of the most lucid, insofar as the solution of the present problem is concerned, was set forth by this Court in the case of *Price v. State,* 5 Md. App. 127, 245 A. 2d 600, 603 wherein we said:

> "In the instant case the declaration was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant. She was still emotionally engulfed by the situation. We find no error in the court's ruling."

Smith argues that the lapse of time and the fact that the child was decribed as placid by one of the physicians and calm by the mother is sufficient to distinguish this case from *Reckard v. State,* 2 Md. App. 312, 234 A. 2d 630 and inferentially from *Price v. State, supra.* We are not persuaded. The statement of facts shows that as soon as the child was returned to her home by Smith she was immediately carried to the hospital where she was anesthetized and treated, and then immediately returned to her home where she made the statement after a lapse of only a few minutes alone with her mother. We think the fact that the quoted statement was the first words she spoke after the incident show she was still very much engulfed by the situation, and that her words were the direct result of the preceding occurrence. The tender age of the child would make it unlikely that the exciting influence of the incident had subsided. The time element alone is not the controlling factor, *Stevens v. State,* 232 Md. 33, 192 A. 2d 73. In any event, we cannot say that the trial judge abused his discretion in finding this testimony to be within the *res gestae* exception to the hearsay evidence rule. *Hicks v. State,* 3 Md. App. 225, 231, 238 A. 2d

577, 1 Wharton *Criminal Evidence* § 279 (12th Edition), 6 Wigmore *Evidence* § 1750.

Smith relies particularly on *Brown v. United States,* 152 F. 2d 138 (D. C. 1945) wherein the Court held inadmissible a statement of a very young child to her mother three hours after an alleged attack which was the sole evidence that such an assault had been committed. The Court found that the statement was a calm narrative of the events which had transpired. The trial judge, in the case at bar, specifically distinguished the *Brown* case on the basis that the statement here was not a calm narrative of what had transpired, and we note that the *Brown* case could have been decided on the basis that the out-of-court statement of the young child was not sufficient, of itself, to support a conviction. In the present case there is ample evidence that, aside from the statement of the child, an assault had occurred and the testimony is used only to support other circumstances to prove the identity of the criminal.

Smith also relies on *Ketcham v. State,* 162 N.E.2d 247 (Ind. 1959) where the Court held inadmissible a statement of a five year old victim to her mother two hours after an alleged rape had taken place. Once again the statement of the child was the sole evidence as to the penetration, and the trial judge here distinguished *Ketcham* on the basis that there was no spontaniety but that the story was obtained very reluctantly by a series of questions; whereas, in the present case the statement was responsive to no question. Other courts have admitted such statements, see 159 ALR 1359. *Res gestae* statements by incompetent witnesses are usually not inadmissible, 6 Wigmore *Evidence,* § 1760, 83 ALR 2d 1368, and 2 Jones *Evidence* § 331 (Fifth Edition).

Smith finally contends the trial court committed error in allowing the state to introduce evidence concerning prior convictions for the possession of narcotics and for disorderly conduct since neither of these crimes was such as tended to impeach the defendant's credibility as a witness. In *Gunther v. State,* 4 Md. App. 181, 241 A. 2d 907, this Court held that the admission of prior convictions for the purpose of impeachment was a matter within the discretion of the trial judge, and, at least in a court trial, as opposed to a jury trial, it was not re-

versible error to admit a prior conviction for malicious destruction of property. In other cases we have held the convictions for assault, for the purposes of impeachment, did not constitute abuse of the trial judge's discretion, *Huber v. State,* 2 Md. App. 245, 234 A. 2d 264, *Stewart v. State,* 4 Md. App. 565, 244 A. 2d 452. We think a conviction for possession of narcotics is certainly as relevant to bear on credibility as a conviction for assault, and we do not think that the fact that the conviction was seven years prior to the trial was sufficient to make it too remote for a crime which is not infamous under the law as laid down in *Cousins v. State,* 230 Md. 2, 185 A. 2d 488. The only objection below to the admissibility of the disorderly conviction was to the effect that the state should be required to establish proof thereof which was thereafter accomplished to the satisfaction of counsel. Under Maryland Rule 1085 there is nothing for us to review as to this conviction.

*Judgment affirmed.*