Craig Allen CHAMBERS,
Appellant (Defendant),

v.

The STATE of Wyoming,
Appellee (Plaintiff).

No. 84–240.

Supreme Court of Wyoming.

Oct. 22, 1986.

Leonard D. Munker, State Public Defender, Martin J. McClain, Deputy State Public Defender (argued), and Gerald E. Huber, Student Intern, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen and Sylvia Lee Hackl (argued), Sr. Asst. Attys. Gen., for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT, and MACY, JJ.

CARDINE, Justice.

Appellant Craig Chambers was convicted by a jury of second degree sexual assault under § 6–2–303(a)(v), W.S.1977. During the trial, the district court admitted the videotaped, out-of-court testimony of the alleged victim. The court also allowed the jury to view the videotape twice during deliberations. Appellant contends that the hearsay rule and his right of confrontation were both violated when the videotape was shown at trial. He also maintains that it was fundamentally unfair for the jury to view the videotape during deliberations.[1] We will reverse and remand for a new trial.

## FACTS

On the evening of January 30, 1984, appellant arranged to meet the victim's aunt at the home of the five-year-old female victim. The victim's mother consented to the appellant coming to her home upon the condition that her sister, the victim's aunt, leave with appellant upon his arrival. Before appellant arrived, the victim's aunt took sleeping pills to combat a headache and fell fast asleep. Appellant arrived and was permitted to remain with the aunt in the living room until the drug wore off and she could be aroused. The victim's mother went to bed.

The victim's statement of what occurred was heard by the jury six times; it was heard once when she testified live, twice when her mother and the police officer each repeated her testimony, and three times on videotape. According to the victim, appellant came to her bedroom late that night, awakened her, and asked her to come to the living room with him. They sat together on a loveseat next to the couch where the victim's aunt was still sleeping. Appellant tried to induce the victim to touch his genitals. When that failed, he fondled her partially unclad body and inserted his finger into her vagina. The victim's mother heard her daughter's voice from the living room and told her to go back to bed. The victim then went to the bathroom but was followed by appellant who kissed her on the chest and stomach. She then went to bed and was not molested further.

---

1. In their original briefs and at oral argument, the parties concentrated on the admissibility of the videotape at trial. While this case was under advisement, we decided the case of *Schmunk v. State*, Wyo., 714 P.2d 724 (1986) in which we questioned the practice of submitting testimonial videotapes to the jury during deliberations. We concluded that it would be helpful if the parties, concentrating on this issue, submitted additional briefs and reargued this case. We have extracted appellant's contentions from his original briefs as well as the brief he prepared for reargument.

Appellant and the victim's aunt left the following morning. After they were gone, the victim told her mother what had happened, and her mother immediately called the police. Officer Jack Branson of the Evansville Police Department visited the victim at her home that morning, listened to her story, and contacted the Department of Public Assistance and Social Service to arrange for a physical examination; but, because of a mixup, no examination ever took place.

On February 3, 1984, three days after the incident, the victim and her mother went to the Natrona County Sheriff's Office for a videotaped interview. Present at the session were the victim, her mother, a cameraman, Officer Branson, and Officer Judi Cashel of the Casper Police Department. A criminal complaint had not yet been filed against appellant so neither he nor his attorney observed the session.

In the twenty minutes of questioning, Officers Branson and Cashel were able to cover the entire incident in substantial detail. As might be expected, many of their questions to the five-year-old victim were leading. When the victim became confused or seemed to contradict parts of her earlier story, the examiners would go over her testimony again until a consistent, understandable story emerged. As the session came to a close, the video portion of the interview was cut off, but about thirty seconds of dialogue between the officers, the victim, and her mother could be heard.[2] The victim was praised for her performance.

On February 6, 1984, three days after the videotaping session, a criminal complaint and warrant were filed against appellant charging him with one count of second degree sexual assault and one count of indecent liberties. He was arrested on February 7. A few days before trial, the prosecutor elected to dismiss the indecent liberties count and proceed solely on the charge of second-degree sexual assault. The case went to trial on June 4, 1984.

The five-year-old victim was the State's first witness. She told what happened in great detail, essentially repeating the story she had told the day after the incident and at the videotaped interview. On cross-examination, defense counsel raised the possibility that the victim had fabricated the story under the influence of her mother and the police. He asked her: "How come you remember so well what happened that night with Craig then?" She replied: "'Cause he, 'cause they said a letter, handed me and said read all of it, and it had the gross stuff on it." Defense counsel then asked: "Well, then most of what you are telling came from what you read on that letter then?" "Yes," she answered. The letter to which the victim referred was a transcript of her preliminary hearing testimony.

Later in the same cross-examination the following conversation between defense counsel and the victim occurred:

"Q. [By defense counsel] And you have talked, you got to talk to [the prosecutor] a few times, haven't you?

"A. Yes.

"Q. And you talked to Mr. Branson, haven't you?

"A. Yes.

"Q. And you and your mom may have talked about this quite a bit too?

"A. Yes.

"Q. And then Nancy, you know Nancy?

"A. Yes.

"Q. She talked to you a lot about it too, hasn't she?

"A. Yes.

"Q. And they sort of helped you go over the details a little, helped go over somewhat you remember about it?

"A. Yes.

"Q. Like to remind you that Amanda [the victim's younger sister] peed in the bed that night?

"A. Yes.

"Q. They sort of helped you out."

The victim's mother was the next prosecution witness. After explaining the

2. Apparently, the cameraman replaced the lens    cap before he shut off the microphone.

events as she perceived them the night of the incident, she was asked by the prosecutor to repeat the story that her daughter had told her the following morning. Defense counsel objected upon hearsay grounds. The prosecutor responded that the statement was admissible because it corroborated the victim's trial testimony. The court overruled the objection. The victim's mother then repeated what her daughter had told her, a story which was consistent with the daughter's trial testimony.

While cross-examining the victim's mother, defense counsel again raised the possibility that the victim had fabricated the story of the sexual assault under the influence of her mother:

"Q. [By defense counsel] Did you ever ask Craig Chambers for money?

"A. No, I know he doesn't have any.

"Q. You know his parents probably do though, right?

"A. I didn't even know he had any parents in Casper.

"Q. Okay. So you are saying now that you never asked him for money not to report this?

"A. No, I never asked him."

The prosecutor attempted to rebut this charge with his next witness, Officer Branson. He asked the officer to repeat what the victim had said the morning after the alleged assault. Defense counsel made a hearsay objection which the court overruled, and the officer answered the question. This account of the incident matched both the victim's trial testimony and the story her mother had repeated for the jury.

Before Officer Branson was finished, the prosecutor offered a third out-of-court statement to bolster the victim's trial testimony, the videotaped testimony of the victim taken several days after the incident. Over defense counsel's objection, the videotape was shown to the jury in its entirety.

Appellant testified on his own behalf and denied the victim's story which at that point in the trial had been repeated to the jury four times—by the victim, the victim's

mother, Officer Branson, and through the videotape. Appellant said that the victim came to the living room on her own because she couldn't sleep, sat on the loveseat by herself, and went back to bed twenty minutes later after her mother called to her. He testified that he never touched her. He alleged that the victim's mother called him on the telephone the next morning after he had left and said she would report him for molesting her daughter unless he paid her $1,000.

As might be expected in a case of this sort, defense counsel's closing argument was laced with charges of fabrication. He emphasized the suggestability of the victim, the failure of the victim's mother to insist on a medical examination, the victim's reliance on her mother to tell her what was true and what was a lie, the contacts between the police and the victim which could have implanted the story in the child's mind, and the fact that the victim's testimony apparently improved each time she told the story.

Closing arguments ended at 10:42 a.m., the day after the trial began; and the jury retired to deliberate. About an hour later, at 11:50 a.m., the jurors sent a note to the judge asking if they could view the videotape of the victim's testimony again. Defense counsel objected, but the trial court ruled that there could be second viewing in open court. The prosecutor admitted that the viewing should normally be in open court but pointed out that the jury might be better able to hear the tape in the jury room. Defense counsel had no objection to this procedure as long as bailiffs were present to make sure the videotape operator did not talk to the jury. The court appointed an operator to play the videotape in the jury room, instructed him to play it without interruption, and ordered him not to say a word to the jury.

Several hours later, at 2:20 p.m., the bailiff notified the court that the jury wanted to view the videotape another time. Defense counsel again objected on grounds that it was "totally unfair to the Defendant to keep showing this over and over again

* * *." The prosecutor responded that although he could only speculate as to why the jury wanted another viewing, the request should be granted because the jury felt it was necessary. The court accepted this argument stating:

"[W]hen we were looking at this question earlier, it seemed to me there were a fair number of cases which allowed the Jury to go to great lengths as far as looking at evidence and doing various experiments with it, and that type of thing. I think that since the Jury has donated their services to deciding the case, that we ought to accede to their wishes to at least a reasonable extent, as far as viewing this evidence. So I will allow them to look at the videotape again."

Without waiving his substantive objection to the playing of the videotape, defense counsel agreed with the court and the prosecutor that, as a matter of procedure, it should be shown in the same manner that it was shown the first time. The operator was again instructed to show the tape in the jury room without interruption and without talking to the jurors. Within an hour after it viewed the videotape, the jury returned with a guilty verdict. The court eventually sentenced appellant to a term of thirteen to fifteen years in the Wyoming State Penitentiary.

### ADMISSIBILITY OF VIDEOTAPE AT TRIAL

Appellant contends that the victim's out-of-court statements should not have been admitted into evidence through the videotape, her mother, or Officer Branson because the statements were hearsay. The State counters that the statements were not hearsay because they were consistent statements offered to rebut the implied charge of recent fabrication or improper influence. Rule 801(d)(1)(B), W.R.E., states:

"(d) *Statements which are not hearsay.* —A statement is not hearsay if: (1) Prior Statement of Witness.—The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * *

(B) consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive * * *."

■ A witness's prior consistent statements are not admissible under Rule 801(d)(1)(B), W.R.E., unless they were made before the alleged fabrication or improper influence. 4 D. Louisell & C. Mueller, Federal Evidence § 420, at 193 (1980); *State v. Middleton*, 294 Or. 427, 657 P.2d 1215, 1217 (1983); see also *Matter of GP*, Wyo., 679 P.2d 976, 1002 (1984). Statements made by a witness after corrupting forces come into play could be just as fabricated as trial testimony and do not rebut the charge of fabrication just because they are consistent with his testimony at trial.

■ According to appellant, there were no implied charges of fabrication or improper influence at trial, and therefore, the statements should have been excluded as hearsay under the rule. We disagree. Several of the questions asked by defense counsel implied fabrication and improper influence. See Graham, Prior Consistent Statements: Rule 801(d)(1)(B) of the Federal Rules of Evidence, Critique and Proposal, 30 Hastings L.J. 575, 607 (1979). Moreover, when defense counsel asked the victim whether she had talked to the prosecutor and various police officers and whether she was testifying from what was read to her from the preliminary hearing transcript, he was implying that the improper influence was exerted up to the time of trial. In closing argument, defense counsel repeated his charge that improper influence on the victim continued until trial:

"Please note from the videotape, some of the things at the preliminary, through the trial that [the victim's] memory hasn't abated, it has gotten better, the television, MTV, remembered six songs, remembered more clearly what happened that night after talking to [the prosecutor], Nancy Johnson, Jack Branson, Judi Cashel, it has gotten better, and if she testified this afternoon it would probably be better."

Because defense counsel alleged that the improper influence occurred right before trial, the victim's prior statements to her mother and Officer Branson the morning after the incident, and to Officers Branson and Cashel during the videotaping session qualify as prior consistent statements to rebut the charge of fabrication and improper influence. The trial court was correct in admitting them over appellant's hearsay objection.

■ It is important to point out that a videotaped statement, like any other out-of-court statement, is not always admissible simply because there are no hearsay problems. Videotaped evidence may be inadmissible under Rule 403, W.R.E., if it is substantially more unfairly prejudicial than probative. 3 D. Louisell & C. Mueller, supra, § 390, at 666, 671–673. Appellant did not preserve this issue for appeal because he never objected to the videotape on these grounds at trial. We therefore will not address the issue at this time because it is not before us. *Matter of Worker's Compensation Claim of Grindle*, Wyo., 722 P.2d 166 (1986).

It is nevertheless worthwhile that we compare the videotaping procedures here with procedures that are required in states that have adopted statutes which regulate videotaped evidence. For example, Art. 38.071, § 2(a) of the Texas Code of Criminal Procedure (1986 Cum.Supp.) states:

"The recording of an oral statement of the child made before the proceeding begins is admissible into evidence if:

"(1) no attorney for either party was present when the statement was made;

"(2) the recording is both visual and aural and is recorded on film or videotape or by other electronic means;

"(3) the recording equipment was capable of making an accurate recording, the operator of the equipment was competent, and the recording is accurate and has not been altered;

"(4) the statement was not made in response to questioning calculated to lead the child to make a particular statement;

"(5) every voice on the recording is identified;

"(6) the person conducting the interview of the child in the recording is present at the proceeding and available to testify or be cross-examined by either party;

"(7) the defendant or the attorney for the defendant is afforded an opportunity to view the recording before it is offered into evidence; and

"(8) the child is available to testify." See also, e.g., Ariz.Rev.Stat.Ann. § 13–4252 (1985 Cum.Supp.).

Another type of procedure has been adopted by the Arkansas, New Mexico, and Wisconsin legislatures:

"In any prosecution for a sexual offense or criminal attempt to commit a sexual offense against a minor, upon motion of the prosecuting attorney and after notice to the opposing counsel, the court may, for a good cause shown, order the taking of a videotaped deposition of any alleged victim under the age of seventeen (17) years. The videotaped deposition shall be taken before the judge in chambers in the presence of the prosecuting attorney, the defendant and his attorneys. Examination and cross-examination of the alleged victim shall proceed at the taking of the videotaped deposition in the same manner as permitted at trial under the provisions of the Arkansas Uniform Rules of Evidence. Any videotaped deposition taken under the provisions of this Act * * * shall be admissible at trial and received into evidence in lieu of the direct testimony of the victim." Arkansas Stat. Ann. § 43–2036 (1985 Cum.Supp.). See also N.M. Stat.Ann. § 30–9–17 (1984 Cum.Supp.); Wisc. Stat.Ann. § 967.041 (1985 Cum.Supp.).

Although no statute has yet been adopted in Wyoming, these statutes from other states show some of the safeguards that can eliminate unfair prejudice from videotapes. See also M. Belli, Modern Trials §§ 59.1 to 59.21, at 376–430 (1982) (quoting the Uniform Audio-Visual Deposition Act).

## ADMISSION TO THE JURY DURING DELIBERATIONS

The admission of both testimonial and non-testimonial materials into evidence during trial is governed by the rules of evidence. The trial court has broad, but not unlimited, discretion in applying those rules, Rule 403, W.R.E. *Hopkinson v. State*, Wyo., 632 P.2d 79, 101 (1981), cert. denied 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982). The court also has broad discretion in deciding whether to submit *non-testimonial* exhibits, such as non-testimonial writings, audiotapes, or videotapes, to the jury during its deliberations. Annot., 41 A.L.R.4th 812 (1985) (videotapes); *United States v. Zepeda-Santana*, 569 F.2d 1386, 1391 (5th Cir.1978) (audio tape), cert. denied 437 U.S. 907, 98 S.Ct. 3098, 57 L.Ed.2d 1138 (1978).

> "[T]here is no rule of exclusion for tangible exhibits with verbal content. Nontestimonial exhibits with such content, such as contract documents or recordings of criminal acts which are verbal in nature, are generally allowed to go into the deliberations." 3 D. Louisell & C. Mueller, supra, § 390, at 684.

Allowing the jury to review *testimonial* materials during deliberations is another matter entirely. The traditional common law rule was that the trial court had no discretion to submit depositions and other testimonial materials to the jury room for unsupervised review, even if properly admitted into evidence at trial. See *Schmunk v. State*, Wyo., 714 P.2d 724, 744 (1986); *State v. Ross*, 85 N.M. 176, 510 P.2d 109, 110–111 (1973); *State v. Wilson*, 188 Kan. 67, 360 P.2d 1092, 1099 (1961); *State v. Solomon*, 96 Utah 500, 87 P.2d 807, 811 (1939); *Welch v. Insurance Company*, 23 W.Va. 288, 309–310 (1883). The rule was designed to prevent juries from "unduly emphasizing [the submitted testimony] over all of the other testimony in the case." *Schmunk v. State*, supra, at 733; *Elliott v. State*, 168 Ga.App. 781, 310 S.E.2d 758, 762–763 (1983); *Franklin v. State*, 74 Wis.2d 717, 247 N.W.2d 721, 725 (1976).

This court has never had occasion to apply the common law rule to depositions or other writings, but we have held that testimonial videotapes should not be submitted to the jury for unsupervised and unlimited review. Id. at 745. We stated in *Schmunk v. State*, supra, at 745, that "sending the videotape with appellant's adamant refusal to submit to a polygraph to the jury room for viewing was sufficient in itself to require reversal." We noted that the danger of undue emphasis

> "is even greater where testimony is in the form of a videotape, for:
>
> "'Videotape testimony is unique. It enables the jury to observe the demeanor and to hear the testimony of the witness. It serves as a functional equivalent of a live witness [with the jury in the jury room].'" *Id.* at 733 (quoting *United States v. Binder*, 769 F.2d 595, 600 (9th Cir.1985)).

The case at bar is different than *Schmunk v. State*, supra, because here the trial court did not submit the videotape to the jury for unsupervised and unlimited viewing. The court allowed the videotape to be shown in the jury room instead of open court only because all parties agreed that if the tape was to be shown at all, the jury could more easily hear it in the jury room. The court supervised the manner in which the tape was shown by ordering the operator to show it without interruption and without talking to the jurors. Although it is usually better, as a matter of procedure, to replay a videotape or audiotape or to reread transcribed testimonial material in open court, it is not necessarily error to allow a carefully controlled replay or rereading in the jury room. This is especially true when defense counsel agrees, as he did in this case, that the safeguards are adequate. If the court erred in allowing the jury to review the videotape, the error was not in the procedure employed but in the decision to allow additional viewings at all.

Section 1–11–209, W.S.1977, permits a court to refresh the jury's recollection of

trial testimony under certain limited circumstances. The statute provides:

"After the jurors have retired for deliberation, if there is a disagreement between them as to any part of the testimony, or if they desire to be informed as to any part of the law arising in the case, they may request the officer to conduct them to the court where information upon the matter of law shall be given. The court may give its recollection as to the testimony on the points in dispute, in the presence of or after notice to the parties or their counsel."

This statute does not change the common law rule against submitting testimonial materials to the jury for unsupervised and unrestricted review during deliberations, and it does not permit trial courts to repeat large amounts of testimony just because the jury makes such a request. On the contrary, it requires that the court discover the exact nature of the jury's difficulty, isolate the precise testimony which can solve it, and weigh the probative value of the testimony against the danger of undue emphasis. If, after this careful exercise of discretion, the court decides to repeat some testimony for the jury, it can do so in open court in the presence of the parties or their counsel or under other strictly controlled procedures of which the parties have been notified.[3] The more testimony the court repeats, the greater the danger of undue emphasis. Even with the best of procedures, it would not be proper under the statute for the court to reread a transcript or replay a videotape of a witness's entire story just because the jury wants to review all of the testimonial matter that happens to be available or because the jury wants to review the general credibility of the witness. Undue emphasis and delay would be too likely. See *United States v. Nolan*, 700 F.2d 479, 486 (9th Cir.1983), cert. denied 462 U.S. 1123, 103 S.Ct. 3095, 77

L.Ed.2d 1354 (1983). Out-of-court testimony, which is usually less reliable than live testimony that is given under oath, in open court, and subject to cross-examination, should not dominate the jury's deliberations simply because a party was clever enough to record that out-of-court testimony on videotape.

■ In the case at bar, the court improperly abdicated its limited statutory discretion when it allowed the jury to view the entire videotape twice during deliberations. The court did not ask the jurors why they wanted to view the tape, and it did not know which facts the jurors could not agree upon. Without this knowledge the court could not decide which portions of the tape were relevant to the jury's inquiry and could not edit the tape accordingly. The court's failure to exercise any discretion is shown by its statement to the parties prior to the jury's final viewing:

"I think that since the Jury has donated their services to deciding the case, that we ought to accede to their wishes to at least a reasonable extent, as far as viewing this evidence. So I will allow them to look at the videotape again."

Even though the tape was viewed under a fair procedure to which the parties agreed, the danger of undue emphasis was too great to allow two complete viewings. It was error to allow the jury, after it retired, to twice hear and view the entire testimony of the State's only eyewitness to the incident which was the basis for the crime charged.

■ To summarize our holding, a testimonial videotape may never go to the jury for unsupervised viewing during deliberations. In rare circumstances the court may respond to a jury's request by showing portions of a testimonial videotape during an interruption in the deliberations. Under § 1–11–209, W.S.1977, the court must

---

**3.** Section 1–11–209, W.S.1977, does not explicitly mention the submission of the testimony to the jury directly but instead authorizes the trial judge to refresh the jury's recollection from his recollection. If we assume, however, that the judge can refresh his recollection with a transcript or recording before he tells the jury what he remembers, a safe assumption, the judge should also be able to present the transcript to the jury directly so that there are no mistakes in the translation.

ascertain exactly why the jury wants to view the videotape, must decide whether the tape will give the jury key facts without unduly emphasizing a witness's testimony, and must only show the relevant portions under carefully controlled procedures. It is suggested that the kind of request § 1–11–209, supra, contemplates might be an inquiry concerning a witness' testimony as to the width of a street, height of an object, distance, time or some other limited request but not the entire testimony of the witness.

## HARMLESS ERROR

■ There are two reasons why the jury might have asked to see the videotape: to review the substance of the victim's story, or to try to decide whether the victim was excessively coached by the police. Of the four hours and thirty minutes it spent deliberating, the jury used about forty minutes watching the videotape. Within fifty minutes after its second viewing, the jury reached a guilty verdict. Regardless of the reason the jury requested the videotape, it is apparent that the viewings helped the jury reach its verdict. There was at least "a reasonable possibility that in the absence of the error, the verdict might have been more favorable to the defendant." *Bishop v. State*, Wyo., 687 P.2d 242, 247 (1984), cert. denied, 469 U.S. 1219, 105 S.Ct. 1203, 84 L.Ed.2d 345 (1985). The error was prejudicial. See Rule 103(a), W.R.E.; Rule 7.04, W.R.A.P.

## CONSTITUTIONAL ISSUES

Appellant maintains in his brief that the submission of the videotape violated his right to a fair trial and his right to confront his accuser. We need not reach these issues because we have already decided that the court committed reversible error under evidentiary principles. "When constitutionality becomes a question, this court will only consider such an attack as a final resort." *Nehring v. Russell*, Wyo., 582 P.2d 67, 71 (1978).

## THE DISSENT

"The right of trial by jury shall remain inviolate in criminal cases * * *," Art. I, § 9, Wyoming Constitution; and "the accused shall have the right to * * * an impartial jury * * *," Art. I, § 10, Wyoming Constitution. The contemplated jury trial is a fair trial according to law. Is the trial fair if the testimony of the prosecutrix is stated once from the witness stand, repeated three more times during trial, and then repeated twice more during jury deliberations, where the accused testifies just one time? It is obviously unfair, and courts have held it to be so. *State v. Ross*, supra, 510 P.2d 109; *State v. Wilson*, supra, 360 P.2d 1092; *State v. Solomon*, supra, 87 P.2d 807.

The premise for the dissenting opinion is that not only was this a *fair trial* but that the appellant is *GUILTY*. Thus the dissent states:

"[T]he judicial branch of government must acknowledge an accountability to the large majority of our citizens who do not transgress the rules and do not take unlawful advantage of their fellow citizens. [Translation—appellant transgressed and is guilty.] * * * [W]e choose to protect [the constitutional rights of] those criminals [who] have no concern over the ways in which their antisocial conduct deprives others of their property, their freedom, and even their lives. [Translation—appellant is a criminal and is guilty.] * * * [Do we encourage] those persons charged with crime? * * * Are we lending aid and comfort to the enemy?

Keep in mind that appellant denied the charge against him and testified under oath that he did not assault the prosecutrix, and that the jury was unable to find him guilty after retiring to deliberate without reviewing the victim's videotaped testimony twice more. The effect was to permit her to appear twice, in color, on videotape, much as a live witness in the jury room, after the testimony was closed and the trial concluded. But that is unimportant, for the dissent knows that he is *guilty* because he

."transgressed the rules" and is a "criminal". Knowing that he is guilty dispenses with the necessity of a fair trial.

In England and Scotland, two hundred women were burned at the stake as witches each year during the sixteenth century. They were interrogated improperly and tortured; many confessed. They were tried by juries, hand picked by the sheriff to assure convictions. The trials were not fair. But that didn't matter because they were known to be witches anyway. The trial of witches came to America with the Puritans; and in June 1692, in Salem, Massachusetts, four women were convicted of being witches and hanged. This was the criminal justice system in America in 1692; and, if remote in time, the events are surely reminders of the vigilance necessary to preserve our rights as free men.

Other injustices heaped upon the colonists were searches and seizures, arrests, jailing without process of law, taking of property, and quartering of soldiers in homes. In this background, our constitution was drafted and adopted. It guarantees to all citizens certain inalienable rights among which is the right to a fair trial. But the dissent seems to suggest that we should abolish these sacred rights of all citizens when it is stated:

> "[D]o we not have an obligation to speculate upon the relationship between our rulings which favor the individual rights of those persons charged with crime and the encouragement that they may afford to those who are disposed to disregard the rules? Are we lending aid and comfort to the enemy? Ought we not contemplate, if not speculate upon, the adverse import of our decisions on our citizens generally and the effect upon their freedoms?"

Surely it is not suggested that we abolish the constitution and the right to a fair trial as the means for dealing with crime. The dissent comes perilously close to suggesting just that.

Statistics are cited concerning crime in America and its devastating effect upon all of us. We recognize this very real problem, but we do not accept the proposition that depriving this appellant of a fair trial will solve the problem. We must also be cognizant of statistics that tell us that innocent persons are convicted and imprisoned for crimes they did not commit.[4] We are not prepared to opt for a criminal justice system that permits one charged with a crime to be imprisoned nine months, interrogated daily, and denied the right to counsel until the investigation is completed as could have occurred in Russia in a recent celebrated incident in which a U.S. citizen was charged with a crime.[5] Such a system probably results in more convictions, but surely the price is that more innocent persons are imprisoned.

Having discussed policy considerations, we go now to the legal issues raised. First the dissent accuses the court of "supererogation" (super seizing without justification) in citing *Schmunk v. State*, supra, 714 P.2d 724, for the proposition that "testimonial videotapes should not be submitted to the jury for unsupervised and unlimited review." But that is precisely what we said in Schmunk when we stated:

> "We note here that the practice of sending the videotaped testimony of a witness to the jury room for repeated viewing during deliberation poses the danger of unduly emphasizing that testimony over all of the other testimony in the case." Id. at 733.

We were discussing only the Dr. Schmunk videotape made out of court before trial. Even the dissenting justices in *Schmunk* acknowledged the unfairness when they said:

> "[W]ith reference to the comment in the majority opinion concerning the unfairness which results from a jury viewing a

---

4. Hugh Alan Bedau and Michael Redelet, Miscarriage of Justice in Potentially Capital Cases (Revised draft 9/20/86), a study of innocent persons convicted of capital crimes between 1900 and 1985.

5. Newsweek, Sept. 22, 1986, at 23.

video tape in the jury room and, thus, giving undue emphasis to a portion of the testimony, I agree. I believe that this Court should, by rule, direct that any verbatim record of question-and-answer testimony, video tape or deposition, or otherwise, whether admitted as an exhibit or otherwise, shall not be subject to jury inspection other than as permitted to be read or shown during that part of the trial in which evidence is being received." Id. at 751.

The dissent here attempts to distinguish between an oral statement, under oath, at trial as "testimony" and an oral statement videotaped before trial, not under oath, as an exhibit but not testimony. But in this case the videotape of the prosecutrix was almost identical to her testimony at trial. It was testimonial in nature and prohibited. If the dissent is adamant in its position that the testimony of the prosecutrix must go to the jury, surely it is better that her testimony at trial, under oath, be transcribed and given to the jury rather than her unsworn videotaped testimony. And, if the dissenting position were to be law from here on, I would strongly urge that all counsel videotape their witnesses in the best staged production possible, for that self-serving testimony, being an exhibit, must, according to the dissent, go with the jury for use in their deliberations.

The dissent next moves from its claim of "supererogation involved in reliance upon *Schmunk*" to a claim of "arrogation" in finding the jury viewing of the videotape to be prejudicial because it is claimed that Rule 606(b), W.R.E., "prohibits inquiry in any form with respect to 'any matter or statement occurring during the course of the jury's deliberations * * *.'" Were this the law, a jury verdict, though obviously wrong, could never be vacated or corrected. Fortunately it is not the law. We recognize that under Rule 606, W.R.E., it is improper to *question* jurors about what went through their minds during deliberations. But Rule 606 is procedural not substantive. It does not prevent the court from reaching conclusions about how improper evidence impacted the jury. Thus, it is said that:

"Verdicts may be set aside or altered out of concern over the conduct or *probable* thought processes of the jury in many circumstances which lie beyond reach of Rule 606(b). Often the Rule simply does not come into play because courts are willing to take corrective action without seeking evidence of any kind from a juror * * *.

"The first category, requiring no testimony or affidavit by a juror, is broad indeed. Rule 606(b) in no way affects the grant of a new trial under FRCrimP 33 [Rule 34, W.R.Cr.P.] or FRCP 59 [Rule 59, W.R.C.P.] on account of (i) improper appeals to passion or prejudice in the argument of counsel, (ii) passion or prejudice manifested in the verdict itself (as indicated, for example, by excessive or inadequate verdicts), (iii) failure properly to follow the judge's charge (as indicated, for example, by excessive or inconsistent verdicts), or (iv) a compromise verdict, if the fact of compromise can be discerned on the face of the verdict itself. *And of course it is true that verdicts may be upset for error in the receipt or exclusion of evidence, and in these cases invariably the question is whether the error affected the verdict (necessarily meaning that it affected the thought processes of the jurors)."* (Footnotes omitted and emphasis added.) 3 D. Louisell & C. Mueller, Federal Evidence § 290, at 149–151 (1979).

It is next suggested that the jurors may have wished to view the videotape to demonstrate the lack of credibility of the prosecutrix. First of all, it makes no difference why the jury wished to see and hear the videotape. It was error, and that is enough. And any doubt about why the jury wished to view the videotape again was dispelled by the actual viewing, for they almost immediately thereafter decided that appellant was guilty.

Our final comment concerns the statement that acknowledging the presumption of innocence "does not require that we be

insensitive to the effect of Chambers' acts upon the innocence of this little girl." The statement presumes Chambers' guilt, not his innocence. But, more importantly, it suggests that appellant will go free. That, of course, is not correct. The case is remanded for trial. This disposition is not novel in the history of jurisprudence. We have reversed and remanded in many cases, for example *Krucheck v. State,* Wyo., 702 P.2d 1267 (1985), a case in which defendant was convicted of second degree murder, retried and again convicted of second murder. If we, as an appellate court under the guise of being tough on crime, were to slavishly affirm every verdict as suggested, there would be no reason for our existence. We have no hesitation in here remanding for a new trial.

## PROSPECTIVE APPLICATION

The State contends that we are creating a new rule of law which should be applied prospectively only. But to be applied prospectively only, a decision " 'must establish a new principle of law, either by overruling clear past precedent on which litigants may have relied, * * * or by deciding an issue of first impression whose resolution was not clearly foreshadowed * * *.' " *Adkins v. Sky Blue, Inc.,* Wyo., 701 P.2d 549, 552 (1985) (quoting *Chevron Oil Company v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971)). The rule we are stating in this case is neither new nor surprising, see *Schmunk v. State,* supra, 714 P.2d at 744 and § 1-11-209, W.S.1977. And, even if it were, we would still have grave doubts about its purely prospective application. The error in this case was not a minor technical point to be corrected for future cases; it was a serious mistake which affected the fairness of appellant's trial. If an appellant could not profit by winning an appeal like this one, then meritorious appeals would be discouraged and errors would continue to plague the law.

Reversed and remanded for a new trial.

BROWN, Justice, specially concurring.

I agree that this case must be reversed. However, I do not agree with everything said by the majority in its reaction to the dissent. In this portion of its opinion the majority refers to a suspect statistic to the effect that numerous innocent persons are languishing in prison. The specter of innocent people being charged and convicted is a myth, perpetuated and magnified by fictitious television movies.

I do not know of any empirical study that supports the statistic referred to by the majority. It sounds like a convenient figure plucked out of the air by an organization which has a philosophy that no one should be convicted of anything.

In America the possibility of an innocent person being convicted and his conviction being upheld is minimal. At all stages of a charge, investigation, trial and appeal an accused is clothed with innumerable safeguards to insure that he is not wrongfully convicted.

Lastly, the majority's reference to witch trials in England in the 16th Century, the Salem, Massachusetts trial of witches in 1692 and what might have happened in the Soviet Union is misplaced; these trials do not have a remote relationship to America's justice system.

THOMAS, Chief Justice, dissenting.

I concur in the conclusion of the majority that the prior statements of the victim which were made to her mother, to the police officer, and in the form of the videotape were admissible in evidence in this case. I would add that in the context of the record and the rulings which were made by the district court these statements were admissible not only as prior statements consistent with the victim's testimony and offered to rebut an express or implied charge of recent fabrication, improper influence or motive, but they also were admissible in accordance with precedent in the State of Wyoming and under the "excited utterance" exception to the hearsay rule set forth in Rule 803(2), W.R.E.

Traditionally, in Wyoming the statements of a victim of a sexual assault have

been held admissible to demonstrate that the victim made an appropriate disclosure of the event such as would naturally be expected under the circumstances. *Elliott v. State,* Wyo., 600 P.2d 1044 (1979); *Elmer v. State,* Wyo., 463 P.2d 14 (1969); *State v. Mau,* 41 Wyo. 365, 285 P.2d 992 (1930). The court properly exercised its discretion in admitting the complaints made to the mother and to the police officer in accordance with these decisions. The "excited utterance" exception to the hearsay rule also would justify the admission of the statements to the mother and to the police officer in the exercise of the court's discretion. See e.g., *Smith v. State,* 6 Md.App. 581, 252 A.2d 277 (1969); *State v. Cox,* 303 N.C. 75, 277 S.E.2d 376 (1981); *Daywood v. State,* 157 Tex.Cr.R. 266, 248 S.W.2d 479 (1952). Because the precise amount of time within which the statement must be made in order to come within this rule is not an arbitrary or absolute one, and the courts have recognized that a longer time span may be appropriate in the case of a young child, the court appropriately could have admitted the videotape statement under this exception to the hearsay rule as well. See e.g., *State v. Evans,* 104 Ariz. 434, 454 P.2d 976 (1969); *People v. Lovett,* 85 Mich.App. 534, 272 N.W.2d 126 (1978); *State v. Martineau,* 114 N.H. 552, 324 A.2d 718, 89 A.L.R.3d 93 (1974); *State v. Padilla,* 110 Wis.2d 414, 329 N.W.2d 263 (1982); Annot., 89 A.L.R.3d 102 (1979). In addition to the justifications articulated in the majority opinion, there was ample basis for the trial court to admit the statements of the victim to her mother, the police officer and the videotape statement.

I must dissent from the majority conclusion that the case should be reversed and remanded for a new trial because of the assumption that prejudicial error occurred in permitting the jury to have access to the videotape statement during the course of its deliberations and to view that videotape on two occasions. My difference with my brethren is premised upon both philosophical and substantive reasons.

In the process of deciding criminal cases, the judicial branch of government must acknowledge an accountability to the large majority of our citizens who do not transgress the rules and do not take unlawful advantage of their fellow citizens. Prior to the drafting of the Constitution, our forefathers noted in the Declaration of Independence para 2 (U.S.1776), "that all men * * * are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the pursuit of Happiness." We should recognize that our government was formed through the Constitution to secure these unalienable rights. The Preamble to the Constitution translates this concept by stating that this country was formed in part "to form a more perfect Union, to establish Justice, insure domestic Tranquility, * * * promote the general Welfare, and secure the Blessings of Liberty to ourselves and our Posterity, * * *." The judicial branch of government should avoid the sacrifice of these principles on the altar at which we have come to venerate the rights articulated in Section 2 of Article III, and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States, which in most respects are duplicated in state constitutions. In Wyoming these rights are incorporated in Article 1, §§ 4, 6, 10, 11 and 14 of the Constitution of the State of Wyoming. Security from unreasonable searches and seizures, protection against self-incrimination, protection against double jeopardy, due process of law, the right to a fair trial, the assistance of counsel, the right of confrontation, and equal protection standards need not be translated into a license to deprive others of life, liberty and the pursuit of happiness. The concept of justice must address victims as well as miscreants. Justice, domestic tranquility, the general welfare, and the blessings of liberty should afford some hope of being free from the evils of crime in our society.

One might argue that there is empirical data demonstrating the loss of those specific constitutional rights in the form of a plethora of decisions by appellate courts and trial courts which in each instance perceived that some individual had been de-

prived of one or more of them. In the microscopic examination of those situations, however, the courts should not lose the view afforded by the telescope of experience. That experience teaches that citizens in this country, as we approach the end of the twentieth century, may hazard death although we have a right to life; spend our time in the special prisons which our dwellings have become although we are promised liberty; and indeed even live, not in the pursuit of happiness, but locked in the grasp of domestic terrorism. These are deprivations of constitutionally recognized rights inflicted by those whom we choose to protect even though those criminals have no concern over the ways in which their antisocial conduct deprives others of their property, their freedom, and even their lives.

I am cognizant of the argument that in protecting the rights of the individual we protect the rights of all. Can we be so sure that is true when we consider the unwarranted level of crime in our society? Is it possible to completely disregard in an analysis of the fruit of our decisions in criminal cases such propositions as the fact that approximately 3.2% of our American citizenry, some six million persons, are victims of violent crimes each year or that the lifetime chance of being murdered is one in twenty-one for a black male and one in one hundred thirty-one for a white male? Should we not recognize that among males ages 16 to 24 about one in twelve each year will be a victim of violent crime? Crime and Justice Facts, 1985, Bureau of Justice Statistics, U.S. Department of Justice. As Judge Learned Hand said:

> "Our dangers do not lie in too little tenderness to the accused. Our procedure has been always haunted by the ghost of the innocent man convicted. It is an unreal dream. What we need to fear is the archaic formalism and the watery sentiment that obstructs, delays, and defeats the prosecution of the crime." *United States v. Garsson*, 291 F. 646, 649 (S.D.N.Y.1923).

If we are inclined to speculation, do we not have an obligation to speculate upon the relationship between our rulings which favor the individual rights of those persons charged with crime and the encouragement that they may afford to those who are disposed to disregard the rules? Are we lending aid and comfort to the enemy? Ought we not to contemplate, if not speculate upon, the adverse import of our decisions on our citizens generally and the effect upon their freedoms?

It is not my purpose to denigrate the necessity for observing constitutional protections. I have voted and written in favor of individual rights during my career on the bench. It does seem to me, however, that the courts, particularly a state supreme court, must accomplish that end with a good deal of circumspection. We should reverse cases only when it is patently necessary, and only when the basis for the ruling is ineluctable. Our decisions must be incisive.

I then critique the majority opinion in this case in this way. It depends upon the principle of supererogation and results in a manifestation of arrogation which I perceive as a denigration of the jury system. The result is antithetical to our norm of veneration of the jury system.

What of supererogation? I begin with the claim by the majority that "we have held that testimonial videotapes should not be submitted to the jury for unsupervised and unlimited review," citing *Schmunk v. State*, Wyo., 714 P.2d 724 (1986). As that proposition was articulated in *Schmunk v. State*, supra, it was sheer dictum, and gratuitous dictum at that. Schmunk did not object to the fact that the videotape was furnished to the jury along with the other exhibits. Furthermore, there was no indication that it was viewed by the jury during the course of its deliberations. The only complaint made by Schmunk about the videotape was that it alluded to prior misconduct and encompassed a reference to a refusal to take a polygraph examination. The expansion of that set of circumstances

to the holding claimed for *Schmunk* continues to amaze me.

Perhaps almost as amazing is the effort the majority has made in this case to invoke the provisions of § 1–11–209, W.S. 1977. The same style of stretching is involved as that manifested by reliance upon *Schmunk v. State*, supra, and it begins in the first paragraph in which the videotape statement of the victim is described as "out of court testimony." The videotape statement is evidence, not testimony, within the classic distinction of those two terms described in 31 C.J.S. Evidence § 3 at 818–819 (1943), and in Black's Law Dictionary 1646 (4th ed. 1968). Still, in the opinion of the majority of the court this evidence is alluded to as testimony in a number of places apparently for the purpose of forcing it to fit within the provisions of § 1–11–209, W.S.1977, the reach of which is limited to testimony. See *Hulse v. State*, 35 Ohio St. 421 (1880) which represents the law of origin of this statutory provision.

In Wyoming those cases in which the statute has been cited have emphasized the discretion of the trial judge. *Britton v. State*, Wyo., 643 P.2d 935 (1982); *Jackson v. State*, Wyo., 624 P.2d 751, cert. denied 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981); *Hoskins v. State*, Wyo., 552 P.2d 342, reh. denied 553 P.2d 1390 (1976), cert. denied 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977); and *State v. Riggle*, 76 Wyo. 1, 298 P.2d 349, reh. denied 76 Wyo. 63, 300 P.2d 567 (1956). The statute may represent an extension of the common law as it treats with testimony, but in the contemplation of the legislature it probably had nothing to do with evidence such as the videotape statement. Even in the discussion of the law of other states this distinction is blurred in the majority opinion as can be seen by comparing the Texas statute quoted at pages 7–8 of the slip opinion, which clearly deals with the statements such as that involved here, and the New Mexico statute and Wisconsin statute quoted at page 8 of the majority opinion which treats with the videotaping of testimony, not a statement, of the victim.

I note reliance in the majority opinion upon the case of *United States v. Binder*, 769 F.2d 595 (9th Cir.1985), which similarly is distinguishable because of the fact that testimony was in fact at issue in that case not simply a statement of the witness. Furthermore, I would commend the views of the dissenting judge in *Binder* who clearly notes the distinction which is blurred by the majority in this instance and suggests that the trial judge did not abuse his discretion there. I would hold similarly in this case that the trial judge did not abuse his discretion in permitting the evidence in the form of the videotape statement to go to the jury at the time they retired to deliberate.

We come then to the essential holding in this case that it was prejudicial error to permit the jury to view the videotape during the course of its deliberations. We move at this point from the supererogation involved in reliance upon *Schmunk v. State*, supra, and § 1–11–209, W.S.1977, to arrogation. The majority of this court effectively has substituted itself for the jury in this case. The message of the majority opinion is clear; it says, if the justices were weighing this evidence, their determination inevitably would be influenced adversely to Chambers by the repetitive viewing of the videotaped statement. The majority then leaps to the conclusion that the prejudicial impact must have occurred in the deliberations of this jury. The assumption is that, even in following the demands of their oaths as jurors and the instructions of the district judge, these jurors could not control their subjective response to the repetitious viewing of this evidence.

A further difficulty with this case is that the majority concludes that it may discern prejudice based purely upon conjecture. In identifying the repetitious viewing of the videotape as prejudicial, the majority takes a firm stand that it is entitled to speculate upon the impact of those viewings upon the minds of the jurors during the course of their deliberations. This has to be recognized as a significant invasion of the pre-

rogatives of the members of this jury and also of the jury system itself.

I long have held to the simple maxim in reviewing criminal cases that if there is no blood there was no foul which requires a penalty. A more sophisticated translation, which is generally accepted in appellate jurisprudence, is that in the absence of prejudice any error is not important. The majority view now is that if the court assumes the presence of blood then a foul must be found, i.e., if by speculation prejudice to the defendant appears to be present then some error of law must have occurred. This is not a valid judicial process and quite clearly puts the cart before the horse. Our task in reviewing cases on appeal is to consider whether an error of law occurred, and if we find that one did, we still need not reverse unless we find that the horse was followed by the cart of prejudice.

I object to the assumption of impropriety in a situation in which the very rules that this court has adopted would foreclose any demonstration of prejudice. Rule 606(b), W.R.E., prohibits inquiry in any form with respect to "any matter or statement occurring during the course of the jury's deliberations or to *the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict* or indictment *or concerning his mental processes in connection therewith,* * * *."* (Emphasis added.) The commentators identify a clear distinction between those matters which occur outside the deliberations of the jury and those matters that occur in the course of the jury's deliberations. 3 J. Weinstein & M. Berger, Weinstein's Evidence ¶ 606[04] (1985); 3 D. Louisell & C. Mueller, Federal Evidence §§ 286–287 (1979). The cases closest in point are those in which there was a contention that one or more of the jurors misused some portion of the evidence. Proof of that assertion would be foreclosed by Rule 606(b), W.R.E. *United States v. Crosby,* 294 F.2d 928 (2d Cir.1961), cert. denied, sub nom *Mittelman v. U.S.,* 368 U.S. 984, 82 S.Ct. 599, 7 L.Ed.2d 523, reh. denied 369 U.S. 881, 82

S.Ct. 1138, 8 L.Ed.2d 285 (1962); *Morgan v. Sun Oil Co.,* 109 F.2d 178 (5th Cir.1940), cert. denied 310 U.S. 640, 60 S.Ct. 1086, 84 L.Ed. 1408 (1940). The policies in support of such a restriction have been said to be "(1) discouraging harassment of jurors by losing parties eager to have the verdict set aside; (2) encouraging free and open discussion among jurors; (3) reducing incentives for jury tampering; (4) promoting verdict finality; (5) maintaining the viability of the jury as a judicial decision-making body. [Citations omitted.]" *Government of Virgin Islands v. Gereau,* 523 F.2d 140, 148 (3d Cir.1975), cert. denied 424 U.S. 917, 96 S.Ct. 1119, 47 L.Ed.2d 323 (1976). My position succinctly is if we could not set aside this jury verdict because we would not permit a member of the jury to testify that the repetitive viewing of the videotape had an adverse impact upon the jury's deliberation, how can we set aside that verdict based upon our assumption of facts which cannot be proved.

In any event, if we are free to speculate about the deliberations of this jury, should we not at least consider the alternative speculation? We have no way of knowing that the requests to view the videotape did not come from members of the jury who had doubts as to Chambers' guilt. Perhaps they wanted to have their fellow jurors view the videotape again so that they could make a point as to how it in some way demonstrated a lack of credibility on the part of the victim. This is exactly the point that was made by the dissenting judge in *United States v. Binder,* supra who quoted the concern of the trial judge there that the viewing of the videotape in the course of the jury's deliberations might be beneficial to the defendant. If the only speculation we are permitted to engage in must favor a defendant, then we cannot claim that we have been faithful to the rights, needs and concerns of the other members of our society.

The result reached by the majority opinion to the effect that the court may assume the effect of this evidence upon a juror's mind or emotions as influencing that juror

to assent to the verdict and with respect to the jurors' mental processes in connection therewith is a significant invasion of the jury process. In some respects this arrogation is almost condescending. The court says to the members of this jury that we know better than they what the dynamics were with respect to their deliberations and what the impact was of this evidence. Yet, it may have been completely lawful. If this approach is permissible, what then prevents the court in any instance in which it disagrees with a jury verdict from speculating upon the evaluation of any or all of the evidence and instructions by the members of the jury and concluding that in some manner the issues must have been adversely influenced and the defendant therefore prejudiced. If that prejudice then can be translated into error, perhaps by a conclusion that the defendant was denied his right to a fair trial, I must wonder what is left of the jury system as we know it. That, of course, would be a complete arrogation, and trying cases to a jury would be of little moment. Verdicts no longer would stand because the jury reached them, but they would stand only if the appellate court agreed with the result. While it is true that we must be sensitive to the presumption of Chambers' innocence, that does not require that we be insensitive to the effect of Chambers' acts upon the innocence of this little girl. We should not reverse the jury's verdict unless it is necessary that we do so. If we must substitute ourselves for the jury, then reversal is not necessary.

It well may be that the use of videotapes in jury trial should be subjected to some form of control by statute or by court rule. The trial court in this case did not violate any precept of jurisprudence known prior to the court's decision in permitting this evidence to go to the jury. There was not any rule which made it unlawful to submit the exhibit to the jury nor to permit the jury to view or examine the exhibit during the course of its deliberations. I expect that both the prosecutor and the trial judge may feel that they have been sandbagged, and it appears that the discretion of the trial judge has been invaded fully as much as the prerogatives of the jury have been invaded.

I am not persuaded of the viability of the authority upon which the majority relies to reverse this conviction. A reversal is not necessary. The result is that we have sacrificed the victim's innocence and the protections afforded to her as a citizen by our constitutional measures upon the altar of a fair trial. I would affirm Chambers' conviction.

For reasons which I cannot fathom the majority is compelled to offer a vigorous and earnest defense to the dissenting opinion. In a way it calls to mind some immortal words of the bard.[1] I confess that I feel professionally uncomfortable in continuing a dialogue with my brothers. On the other hand there may be some danger in the proposition that silence can be interpreted as assent.

I am sure that the majority mischaracterized my position only for effect. Of course, I do not know that Chambers is guilty. I was not present at the scene of this crime. What I do know is that he was found guilty by a jury of 12 people and that verdict was confirmed by a judgment and sentence entered by an experienced trial judge. These individuals fill significant roles in our system of jurisprudence, and their efforts should not be brushed aside lightly.

I note an inconsistency in the ruling of the majority that the videotape was properly admitted into evidence pursuant to Rule 801(d)(1)(B), W.R.E., and the ultimate conclusion that the court can consider how improper evidence impacted the jury. Apparently this shift was made to conform to the quotation from 3 D. Louisell & C. Mueller, Federal Evidence § 290, at 149 (1979), which is taken out of context and is not apropos with respect to the problem in this case. I reiterate that the concern here is with "(ii) the 'effect' of anything upon the 'mind or emotions' of any juror, and (iii) the 'mental processes' of the juror * * *." 3

---

1. Hamlet, Act III, Sc. 2, Line 242.

D. Louisell & C. Mueller, Federal Evidence § 286, at 111 (1979). Any evidence with respect to matters such as this is foreclosed from investigation by Rule 606, W.R.E. It still is clear to me that the majority has substituted its speculation for facts which cannot be developed.

The basic rule which controls this situation is said to be qualified by two major exceptions which are defined in terms of thrust or subject. One of these is defined as "extraneous prejudicial information * * improperly brought to the jury's attention" while the other is defined as "outside influence * * * improperly brought to bear upon any juror." Rule 606(b), W.R.E. Neither exception applies to the examination of evidence by a jury during the course of its deliberations, but in the material quoted in the majority's response to the dissenting opinion reliance is premised upon a quotation from 3 D. Louisell and C. Mueller, Federal Evidence § 290 (1979), which is much like the so-called "holding" in *Schmunk v. State,* supra, i.e., it does not have anything to do with the case. The appropriate quotation out of the text relied upon reads:

> "Where the context and kind of evidence are those described in Rule 606(b), proof to the following effects is excludable thereunder:
>
>     \*    \*   . \*    \*    \*    \*
>
> "—that one or more jurors misused any portion of the evidence in the case; * *."

(Footnote omitted.) 3 D. Louisell and C. Mueller, Federal Evidence § 287 at 121, 122 (1979).

The thrust of the majority's position is that the videotape in some manner was misused by the members of this jury. In a similar vein see *U.S. v. Walls,* 577 F.2d 690 (9th Cir., 1978), cert. denied 439 U.S. 893, 99 S.Ct. 251, 58 L.Ed.2d 239 (1978).

I also am compelled to object again to the reliance on *Schmunk v. State,* supra. Recently a perspicacious friend raised a concern about a possible concept which he described as dictum squared equals stare decisis. Such a principle would dismay discerning legal scholars, but it may be an apt description of fact. Certainly that is exactly what has happened here because the dictum of *Schmunk v. State,* supra, has now been elevated to a quotable holding.

Finally, I make no apology for referring to persons who have been found guilty of a crime by a jury of their peers as criminals. It may be there is a more apt noun, but none came to my mind. Until this opinion is filed Chambers fits that description although one must concede that by reference the majority has restored his presumption of innocence.